**METROPOLITAN LIFE INSURANCE COMPANY and Jefferson–Pilot Life Insurance Company, Plaintiffs,**

v.

**RJR NABISCO, INC. and F. Ross Johnson, Defendants.**

No. 88 Civ. 8266 (JMW).

United States District Court,
S.D. New York.

June 1, 1989.

---

Philip Howard, Jack P. Levin, C. William Phillips, Howard, Darby & Levin, New York City, for plaintiffs.

Michael Bradley, Scott Tross, Brown & Wood, New York City, for defendant RJR Nabisco.

D. Scott Wise, Davis, Polk & Wardwell, New York City, for defendant F. Ross Johnson.

Kenneth Logan, Michael Lamb, Simpson Thacher & Bartlett, New York City, for KKR.

## OPINION AND ORDER

WALKER, District Judge:

### I. INTRODUCTION

The corporate parties to this action are among the country's most sophisticated financial institutions, as familiar with the Wall Street investment community and the securities market as American consumers are with the Oreo cookies and Winston cigarettes made by defendant RJR Nabisco, Inc. (sometimes "the company" or "RJR Nabisco"). The present action traces its origins to October 20, 1988, when F. Ross Johnson, then the Chief Executive Officer of RJR Nabisco, proposed a $17 billion leveraged buy-out ("LBO") of the company's shareholders, at $75 per share.[1] Within a few days, a bidding war developed among the investment group led by Johnson and the investment firm of Kohlberg Kravis Roberts & Co. ("KKR"), and others. On December 1, 1988, a special committee of RJR Nabisco directors, established by the company specifically to consider the competing proposals, recommended that the company accept the KKR proposal, a $24 billion LBO that called for the purchase of the company's outstanding stock at roughly $109 per share.

The flurry of activity late last year that accompanied the bidding war for RJR Nabisco spawned at least eight lawsuits, filed before this Court, charging the company and its former CEO with a variety of securities and common law violations.[2] The

1. A leveraged buy-out occurs when a group of investors, usually including members of a company's management team, buy the company under financial arrangements that include little equity and significant new debt. The necessary debt financing typically includes mortgages or high risk/high yield bonds, popularly known as "junk bonds." Additionally, a portion of this debt is generally secured by the company's assets. Some of the acquired company's assets are usually sold after the transaction is complet- ed in order to reduce the debt incurred in the acquisition.

2. On December 7, 1989, this Court agreed to accept as related all actions growing out of the RJR Nabisco LBO. On January 4, 1989, the Court consolidated with the present suit an action brought by three KKR affiliates—RJR Holdings Corp., RJR Holdings Group, Inc., and RJR Acquisition Corporation—against the Jefferson–Pilot Life Insurance Company. KKR established those entities to effect the buyout of

Court agreed to hear the present action—filed even before the company accepted the KKR proposal—on an expedited basis, with an eye toward March 1, 1989, when RJR Nabisco was expected to merge with the KKR holding entities created to facilitate the LBO. On that date, RJR Nabisco was also scheduled to assume roughly $19 billion of new debt.[3] After a delay unrelated to the present action, the merger was ultimately completed during the week of April 24, 1989.

Plaintiffs now allege, in short, that RJR Nabisco's actions have drastically impaired the value of bonds previously issued to plaintiffs by, in effect, misappropriating the value of those bonds to help finance the LBO and to distribute an enormous windfall to the company's shareholders. As a result, plaintiffs argue, they have unfairly suffered a multimillion dollar loss in the value of their bonds.[4]

On February 16, 1989, this Court heard oral argument on plaintiffs' motions. At the hearing, the Court denied plaintiffs' request for a preliminary injunction, based on their insufficient showing of irreparable harm.[5] An exchange between the Court and plaintiffs' counsel, like the submissions before it, convinced the Court that plaintiffs had failed to meet their heavy burden:

THE COURT: How do you respond to [defendants'] statements on irreparable harm? What we're looking at now is whether or not there's a basis for a preliminary injunction and if there's no irreparable harm then we're in a damage action and that changes ... the contours of the suit.... We're talking about the ability ... of the company to satisfy any judgment.

PLAINTIFFS: That's correct. And our point ... is that if we receive a judgment at any time, six months from now, after a trial for example, that judgment will almost inevitably be the basis for a judgment for everyone else ... But if we get a judgment, everyone else will get one as well ...

THE COURT: [Y]ou're ... asking me ... [to] infer a huge number of plaintiffs and a lot more damages than your clients could ever recover as being the basis for deciding the question of irreparable harm. And those [potential] actions aren't before me.

RJR Nabisco. Throughout this Opinion, these entities and their parent will be referred to collectively as "KKR." When this action was filed, those entities and KKR were not formally named as parties. However, in its January 4 Order, the Court granted KKR's request to participate fully in the present action. Pursuant to that Order, KKR filed joint briefs with RJR Nabisco and participated in oral argument before the Court on February 16, 1989.

3. The Court set January 12, 1989 as the close of the expedited discovery period for these motions, which were filed the next day.

4. Agencies like Standard & Poor's and Moody's generally rate bonds in two broad categories: investment grade and speculative grade. Standard & Poor's rates investment grade bonds from "AAA" to "BBB." Moody's rates those bonds from "AAA" to "Baa3." Speculative grade bonds are rated either "BB" and lower, or "Ba1" and lower, by Standard & Poor's and Moody's, respectively. *See, e.g., Standard and Poor's Debt Rating Criteria* at 10–11. No one disputes that, subsequent to the announcement of the LBO, the RJR Nabisco bonds lost their "A" ratings.

5. In their papers, plaintiffs had argued that the LBO "should be Preliminarily Enjoined Unless Provision is Made to Ensure That Funds for Redemption will be Available after Trial." P.Mem. at 59 (capitalization in original). The preliminary injunction requested "is not intended to stop the transaction, but only to enjoin any substantial encumbrance on the [c]ompany until the [c]ompany posts a bond or otherwise provides security to ensure its ability to redeem Plaintiffs' bonds after trial." P.Mem. at 60.

References throughout this Opinion are as follows: Transcript of February 16, 1989 Argument ("Tr."); Amended Complaint ("Am. Comp."); [Name of affiant] Affidavit ("[Name of affiant] Aff."); [Name of affiant] Response Affidavit ("[Name of affiant] Resp.Aff."); [Name of affiant] Reply Affidavit ("[Name of affiant] Reply Aff."); Exhibit ("Exh."); Plaintiffs' Exhibit ("P.Exh."); [Name of deponent] Deposition ("[Name of deponent] Dep."); Plaintiffs' Memorandum in Support of Summary Judgment ("P.Mem."); Plaintiffs' Answering Brief [in Opposition to Defendants' Motions] ("P.Opp."); Plaintiffs' Reply Brief ("P. Reply"); Defendants' Memorandum in Support of their Motion for Judgment on the Pleadings [and Partial Summary Judgment and Partial Dismissal] ("D.Mem."); Defendants' Memorandum in Opposition to Plaintiffs' Motion ("D.Opp."); Defendants' Reply Memorandum ("D. Reply").

PLAINTIFFS: I think that's correct
...

Tr. at 39. *See also* P. Reply at 33. Plaintiffs failed to respond convincingly to defendants' arguments that, although plaintiffs have invested roughly $350 million in RJR Nabisco, their potential damages nonetheless remain relatively small and that, upon completion of the merger, the company will retain an equity base of $5 billion. *See, e.g.,* Tr. at 32, 35; D. Opp. at 48, 49. Given plaintiffs' failure to show irreparable harm, the Court denied their request for injunctive relief. This initial ruling, however, left intact plaintiffs' underlying motions, which, together with defendants' cross-motions, now require attention.

The motions and cross-motions are based on plaintiffs' Amended Complaint, which sets forth nine counts.[6] Plaintiffs move for summary judgment pursuant to Fed.R. Civ.P. 56 against the company on Count I, which alleges a "Breach of Implied Covenant of Good Faith and Fair Dealing," and against both defendants on Count V, which is labeled simply "In Equity."

For its part, RJR Nabisco moves pursuant to Fed.R.Civ.P. 12(c) for judgment on the pleadings on Count I in full; on Count II (fraud) and Count III (violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder) as to most of the securities at issue; and on Count V in full. In the alternative, the company moves for summary judgment

on Counts I and V. In addition, RJR Nabisco moves pursuant to Fed.R.Civ.P. 9(b) to dismiss Counts II, III and IX (alleging violations of applicable fraudulent conveyance laws) for an alleged failure to plead fraud with requisite particularity. Johnson has moved to dismiss Counts II, III and V.[7]

Although the numbers involved in this case are large, and the financing necessary to complete the LBO unprecedented,[8] the legal principles nonetheless remain discrete and familiar. Yet while the instant motions thus primarily require the Court to evaluate and apply traditional rules of equity and contract interpretation, plaintiffs do raise issues of first impression in the context of an LBO. At the heart of the present motions lies plaintiffs' claim that RJR Nabisco violated a restrictive covenant—not an explicit covenant found within the four corners of the relevant bond indentures, but rather an *implied* covenant of good faith and fair dealing—not to incur the debt necessary to facilitate the LBO and thereby betray what plaintiffs claim was the fundamental basis of their bargain with the company. The company, plaintiffs assert, consistently reassured its bondholders that it had a "mandate" from its Board of Directors to maintain RJR Nabisco's preferred credit rating. Plaintiffs ask this Court first to imply a covenant of good faith and fair dealing that would prevent the recent transaction, then to hold that this covenant has been breached, and final-

**6.** Count I alleges a breach of an implied covenant of good faith and fair dealing (against defendant RJR Nabisco); Count II alleges fraud (against both defendants); Count III alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (against both defendants); Count IV alleges violations of Section 11 of the 1933 Act (on behalf of plaintiff Jefferson–Pilot Life Insurance Company against both defendants); Count V is labeled "In Equity," and is asserted against both defendants; Count VI alleges breach of duties (against defendant Johnson); Count VII alleges tortious interference with property (against Johnson); Count VIII alleges tortious interference with contract (against Johnson); and Count IX alleges a violation of the fraudulent conveyance laws (against RJR Nabisco).

**7.** Johnson has not filed memoranda in support of his motions but instead incorporates the ar-

guments set forth in the papers filed by RJR Nabisco and KKR. Johnson has not moved with respect to Counts IV, VI, VII or VIII. Counts VI, VII and VIII apply only to Johnson. Count IV is the only count with respect to which RJR Nabisco has not moved.

**8.** On February 9, 1989, KKR completed its tender offer for roughly 74 percent of RJR Nabisco's common stock (of which approximately 97% of the outstanding shares were tendered) and all of its Series B Cumulative Preferred Stock (of which approximately 95% of the outstanding shares were tendered). Approximately $18 billion in cash was paid out to these stockholders. KKR acquired the remaining stock in the late April merger through the issuance of roughly $4.1 billion of pay-in-kind exchangeable preferred stock and roughly $1.8 billion in face amount of convertible debentures. *See* Bradley Reply Aff. ¶ 2.

ly to require RJR Nabisco to redeem their bonds.

RJR Nabisco defends the LBO by pointing to express provisions in the bond indentures that, *inter alia,* permit mergers and the assumption of additional debt. These provisions, as well as others that could have been included but were not, were known to the market and to plaintiffs, sophisticated investors who freely bought the bonds and were equally free to sell them at any time. Any attempt by this Court to create contractual terms *post hoc,* defendants contend, not only finds no basis in the controlling law and undisputed facts of this case, but also would constitute an impermissible invasion into the free and open operation of the marketplace.

For the reasons set forth below, this Court agrees with defendants. There being no express covenant between the parties that would restrict the incurrence of new debt, and no perceived direction to that end from covenants that are express, this Court will not imply a covenant to prevent the recent LBO and thereby create an indenture term that, while bargained for in other contexts, was not bargained for here and was not even within the mutual contemplation of the parties.

## II. BACKGROUND

Summary judgment, of course, is appropriate only where "there is no genuine issue as to any material fact ..." Fed.R. Civ.P. 56(c). A genuine dispute exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The burden is on the moving party to show that no relevant facts are in dispute. While the Court must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, *see, e.g., Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 444 (2d Cir.1980), the nonmoving party may not rely simply "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Insur-*

*ance Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

Both sides now move for summary judgment on Counts I and V. In support of their motions, the parties have filed extensive memoranda and supporting exhibits. Having carefully reviewed the submissions before it, the Court agrees with the parties that there is no genuine issue as to any material fact regarding these counts, and given the disposition of the motions as to Counts I and V, the Court, as it must, draws all reasonable inferences in favor of the plaintiffs.

### A. The Parties:

Metropolitan Life Insurance Co. ("MetLife"), incorporated in New York, is a life insurance company that provides pension benefits for 42 million individuals. According to its most recent annual report, MetLife's assets exceed $88 billion and its debt securities holdings exceed $49 billion. Bradley Aff. ¶ 11. MetLife is a mutual company and therefore has no stockholders and is instead operated for the benefit of its policyholders. Am.Comp. ¶ 5. MetLife alleges that it owns $340,542,000 in principal amount of six separate RJR Nabisco debt issues, bonds allegedly purchased between July 1975 and July 1988. Some bonds become due as early as this year; others will not become due until 2017. The bonds bear interest rates of anywhere from 8 to 10.25 percent. MetLife also owned 186,000 shares of RJR Nabisco common stock at the time this suit was filed. Am. Comp. ¶ 12.

Jefferson–Pilot Life Insurance Co. ("Jefferson–Pilot") is a North Carolina company that has more than $3 billion in total assets, $1.5 billion of which are invested in debt securities. Bradley Aff. ¶ 12. Jefferson–Pilot alleges that it owns $9.34 million in principal amount of three separate RJR Nabisco debt issues, allegedly purchased between June 1978 and June 1988. Those bonds, bearing interest rates of anywhere from 8.45 to 10.75 percent, become due in 1993 and 1998. Am.Comp. ¶ 13.

RJR Nabisco, a Delaware corporation, is a consumer products holding company that owns some of the country's best known product lines, including LifeSavers candy, Oreo cookies, and Winston cigarettes. The company was formed in 1985, when R.J. Reynolds Industries, Inc. ("R.J. Reynolds") merged with Nabisco Brands, Inc. ("Nabisco Brands"). In 1979, and thus before the R.J. Reynolds–Nabisco Brands merger, R.J. Reynolds acquired the Del Monte Corporation ("Del Monte"), which distributes canned fruits and vegetables. From January 1987 until February 1989, co-defendant Johnson served as the company's CEO. KKR, a private investment firm, organizes funds through which investors provide pools of equity to finance LBOs. Bradley Aff. ¶¶ 12–15.

## B. The Indentures:

The bonds[9] implicated by this suit are governed by long, detailed indentures, which in turn are governed by New York contract law.[10] No one disputes that the holders of public bond issues, like plaintiffs here, often enter the market after the indentures have been negotiated and memorialized. Thus, those indentures are often not the product of face-to-face negotiations between the ultimate holders and the issuing company. What remains equally true, however, is that underwriters ordinarily negotiate the terms of the indentures with the issuers. Since the underwriters must then sell or place the bonds, they necessarily negotiate in part with the interests of the buyers in mind. Moreover, these indentures were not secret agreements foisted

upon unwitting participants in the bond market. No successive holder is required to accept or to continue to hold the bonds, governed by their accompanying indentures; indeed, plaintiffs readily admit that they could have sold their bonds right up until the announcement of the LBO. Tr. at 15. Instead, sophisticated investors like plaintiffs are well aware of the indenture terms and, presumably, review them carefully before lending hundreds of millions of dollars to any company.

Indeed, the prospectuses for the indentures contain a statement relevant to this action:

> The Indenture contains no restrictions on the creation of unsecured short-term debt by [RJR Nabisco] or its subsidiaries, no restriction on the creation of unsecured Funded Debt by [RJR Nabisco] or its subsidiaries which are not Restricted Subsidiaries, and no restriction on the payment of dividends by [RJR Nabisco].

Bradley Resp.Aff., Exh. L at 24.[11] Further, as plaintiffs themselves note, the contracts at issue "[do] not impose debt limits, since debt is assumed to be used for productive purposes." P. Reply at 34.

### 1. The relevant Articles:

A typical RJR Nabisco indenture contains thirteen Articles. At least four of them are relevant to the present motions and thus merit a brief review.[12]

Article Three delineates the covenants of the issuer. Most important, it first provides for payment of principal and interest. It then addresses various mechanical provisions regarding such matters as payment

---

**9.** For the purposes of this Opinion, the terms "bonds," "debentures," and "notes" will be used interchangeably. Any distinctions among these terms are not relevant to the present motions.

**10.** Both sides agree that New York law controls this Court's interpretation of the indentures, which contain explicit designations to that effect. *See, e.g.,* P.Mem. at 26; D. Mem at 15 n. 23. The indentures themselves provide that they "shall be deemed to be a contract under the laws of the State of New York, and for all purposes shall be construed in accordance with the laws of said State, except as may otherwise be required by mandatory provisions of law." Bradley Aff., Exh. L, § 12.8.

**11.** While nine securities are at issue in this suit, the parties agree—and the Court's review con-

firms—that the separate indentures mirror one another in all important respects, with one exception that is discussed herein. Indeed, plaintiffs have submitted a helpful Addendum in which they outline what they term "[t]ypical RJR Nabisco [i]ndenture [t]erms." *See* P. Reply, Addendum.

Thus, the prospectus statement quoted above has its counterpart in each of the other prospectuses. *See* Bradley Aff. ¶ 9.

**12.** For the following discussion, *see generally,* Indenture dated as of October 15, 1982, between R.J. Reynolds Industries, Inc., Issuer, and Bankers Trust Company, Trustee, included as Bradley Aff.Exh. L, and Plaintiffs' Exh. 1.

terms and trustee vacancies. The Article also contains "negative pledge" and related provisions, which restrict mortgages or other liens on the assets of RJR Nabisco or its subsidiaries and seek to protect the bondholders from being subordinated to other debt.

Article Five describes various procedures to remedy defaults and the responsibilities of the Trustee. This Article includes the distinction in the indentures noted above, *see supra* n. 11. In seven of the nine securities at issue, a provision in Article Five prohibits bondholders from suing for any remedy based on rights in the indentures unless 25 percent of the holders have requested in writing that the indenture trustee seek such relief, and, after 60 days, the trustee has not sued. *See, e.g.,* Bradley Aff.Exh. L, §§ 5.6, 5.7. Defendants argue that this provision precludes plaintiffs from suing on these seven securities. *See* D.Mem. at 22–25. Given its holdings today, *see infra,* the Court need not address this issue.

Article Nine governs the adoption of supplemental indentures. It provides, *inter alia,* that the Issuer and the Trustee can

> add to the covenants of the Issuer such further covenants, restrictions, conditions or provisions as its Board of Directors by Board Resolution and the Trustee shall consider to be for the protection of the holders of Securities, and to make the occurrence, or the occurrence and continuance, of a default in any such additional covenants, restrictions, conditions or provisions an Event of Default permitting the enforcement of all or any of the several remedies provided in this Indenture as herein set forth
> . . .

Bradley Aff.Exh. L, § 9.1(c).

Article Ten addresses a potential "Consolidation, Merger, Sale or Conveyance,"

and explicitly sets forth the conditions under which the company can consolidate or merge into or with any other corporation. It provides explicitly that RJR Nabisco "may consolidate with, or sell or convey, all or substantially all of its assets to, or merge into or with any other corporation," so long as the new entity is a United States corporation, and so long as it assumes RJR Nabisco's debt. The Article also requires that any such transaction not result in the company's default under any indenture provision.[13]

### 2. The elimination of restrictive covenants:

In its Amended Complaint, MetLife lists the six debt issues on which it bases its claims. Indentures for two of those issues—the 10.25 percent Notes due in 1990, of which MetLife continues to hold $10 million, and the 8.9 percent Debentures due in 1996, of which MetLife continues to hold $50 million—once contained express covenants that, among other things, restricted the company's ability to incur precisely the sort of debt involved in the recent LBO. In order to eliminate those restrictions, the parties to this action renegotiated the terms of those indentures, first in 1983 and then again in 1985.

MetLife acquired $50 million principal amount of 10.25 percent Notes from Del Monte in July of 1975. To cover the $50 million, MetLife and Del Monte entered into a loan agreement. That agreement restricted Del Monte's ability, among other things, to incur the sort of indebtedness involved in the RJR Nabisco LBO. *See* promissory note §§ 2.6–2.15, attached as Exhibit A to Bradley Aff.Exh. E. In 1979, R.J. Reynolds—the corporate predecessor to RJR Nabisco—purchased Del Monte and

---

13. The remaining Articles are not relevant to the motions currently before the Court. Article One contains definitions; Article Two contains mechanical terms regarding, for instance, the issuance and transfer of the securities; Article Four concerns such mechanical matters as securityholders' lists and annual reports; Article Six addresses the rights and responsibilities of the Trustee; Article Seven contains mechanical provisions concerning the securityholders; Article Eight concerns procedural matters such as securityholders' meetings and consents; Article Eleven deals with the satisfaction and discharge of the indenture; Article Twelve sets forth various miscellaneous provisions; and Article Thirteen includes provisions regarding the redemption of securities and sinking funds. *See, e.g.,* Bradley Aff.Exh. L.

assumed its indebtedness. Then, in December of 1983, R.J. Reynolds requested Met-Life to agree to deletions of those restrictive covenants in exchange for various guarantees from R.J. Reynolds. *See* Bradley Aff. ¶ 17. A few months later, MetLife and R.J. Reynolds entered into a guarantee and amendment agreement reflecting those terms. *See* Bradley Aff. ¶ 17, Exh. G. Pursuant to that agreement, and in the words of Robert E. Chappell, Jr., MetLife's Executive Vice President, MetLife thus "gave up the restrictive covenants applicable to the Del Monte debt ... in return for [the parent company's] guarantee and public covenants." Chappell Dep. at 196.

MetLife acquired the 8.9 percent Debentures from R.J. Reynolds in October of 1976 in a private placement. A promissory note evidenced MetLife's $100 million loan. That note, like the Del Monte agreement, contained covenants that restricted R.J. Reynolds' ability to incur new debt. *See* Bradley Aff., Exh. H, §§ 2.5–2.9. In June of 1985, R.J. Reynolds announced its plans to acquire Nabisco Brands in a $3.6 billion transaction that involved the incurrence of a significant amount of new debt. R.J. Reynolds requested MetLife to waive compliance with these restrictive covenants in light of the Nabisco acquisition. *See* D.Mem. at 45; Bradley Aff. ¶ 18.

In exchange for certain benefits, MetLife agreed to exchange its 8.9 percent debentures—which *did* contain explicit debt limitations—for debentures issued under a public indenture—which contain no explicit limits on new debt. An internal MetLife memorandum explained the parties' understanding:

> [MetLife's $100 million financing of the Nabisco Brands purchase] had its origins in discussions with RJR regarding potential covenant violations in the 8.90% Notes. More specifically, *in its acquisition of Nabisco Brands, RJR was slated to incur significant new long-term debt, which would have caused a violation in the funded indebtedness incurrence tests in the 8.90% Notes.* In the discussions regarding [MetLife's] willingness to consent to the additional indebtedness, *it was determined that a mutually beneficial approach to the problem was to 1) agree on a new financing having a rate and a maturity desirable for [MetLife] and 2) modify the 8.90% Notes.* The former was accomplished with agreement on the proposed financing, while the latter was accomplished by [MetLife] agreeing to substitute RJR's public indenture covenants for the covenants in the 8.90% Notes. In addition to the covenant substitution, RJR has agreed to "debenturize" the 8.90% Notes upon [MetLife's] request. This will permit [MetLife] to sell the 8.90% Notes to the public.

MetLife Southern Office Memorandum, dated July 11, 1985, attached as Bradley Aff.Exh. J, at 2 (emphasis added).

3. The recognition and effect of the LBO trend:

Other internal MetLife documents help frame the background to this action, for they accurately describe the changing securities markets and the responses those changes engendered from sophisticated market participants, such as MetLife and Jefferson–Pilot. At least as early as 1982, MetLife recognized an LBO's effect on bond values.[14] In the spring of that year, MetLife participated in the financing of an LBO of a company called Reeves Brothers ("Reeves"). At the time of that LBO, MetLife also held bonds in that company. Subsequent to the LBO, as a MetLife memorandum explained, the "Debentures of Reeves were downgraded by Standard & Poor's from BBB to B and by Moody's from Baa1 to Ba3, thereby lowering the value of the Notes and Debentures held by

---

**14.** MetLife itself began investing in LBOs as early as 1980. *See* MetLife Special Projects Memorandum, dated June 17, 1989, attached as Bradley Aff.Exh. V, at 1 ("[MetLife's] history of investing in leveraged buyout transactions dates back to 1980; and through 1984, [MetLife] reviewed a large number of LBO investment opportunities presented to us by various investment banking firms and LBO specialists. Over this five-year period, [MetLife] invested, on a direct basis, approximately $430 million to purchase debt and equity securities in 10 such transactions ...").

[MetLife]." MetLife Memorandum, dated August 20, 1982, attached as Bradley Reply Aff. Exh D, at 1.

MetLife further recognized its "inability to force any type of payout of the [Reeves'] Notes or the Debentures as a result of the buy-out [which] was somewhat disturbing at the time we considered a participation in the new financing. However," the memorandum continued,

> our concern was tempered since, as a stockholder in [the holding company used to facilitate the transaction], we would benefit from the increased net income attributable to the continued presence of the low coupon indebtedness. The recent downgrading of the Reeves Debentures and the consequent "loss" in value has again raised questions regarding our ability to have forced a payout. *Questions have also been raised about our ability to force payouts in similar future situations, particularly when we would not be participating in the buy-out financing.*

*Id.* (emphasis added). In the memorandum, MetLife sought to answer those very "questions" about how it might force payouts in "similar future situations."

> *A method of closing this apparent "loophole," thereby forcing a payout of [MetLife's] holdings, would be through a covenant dealing with a change in ownership.* Such a covenant is fairly standard in financings with privately-held companies … It provides the lender with an option to end a particular borrowing relationship via some type of special redemption …

*Id.,* at 2 (emphasis added).

A more comprehensive memorandum, prepared in late 1985, evaluated and explained several aspects of the corporate world's increasing use of mergers, takeovers and other debt-financed transactions. That memorandum first reviewed the available protection for lenders such as MetLife:

> Covenants are incorporated into loan documents to ensure that after a lender makes a loan, the creditworthiness of the borrower and the lender's ability to reach

the borrower's assets do not deteriorate substantially. *Restrictions on the incurrence of debt, sale of assets, mergers, dividends, restricted payments and loans and advances to affiliates are some of the traditional negative covenants that can help protect lenders in the event their obligors become involved in undesirable merger/takeover situations.*

MetLife Northeastern Office Memorandum, dated November 27, 1985, attached as Bradley Aff.Exh. U, at 1–2 (emphasis added). The memorandum then surveyed market realities:

> Because almost any industrial company is apt to engineer a takeover or be taken over itself, *Business Week* says that investors are beginning to view debt securities of high grade industrial corporations as Wall Street's riskiest investments. In addition, *because public bondholders do not enjoy the protection of any restrictive covenants,* owners of high grade corporates face substantial losses from takeover situations, if not immediately, then when the bond market finally adjusts…. [T]here have been 10–15 merger/takeover/LBO situations where, *due to the lack of covenant protection, [MetLife] has had no choice but to remain a lender to a less creditworthy obligor….* The fact that the quality of our investment portfolio is greater than the other large insurance companies … may indicate that we have negotiated better covenant protection than other institutions, thus generally being able to require prepayment when situations become too risky … [However,] a problem exists. And *because the current merger craze is not likely to decelerate* and because there exist vehicles to circumvent traditional covenants, the problem will probably continue. Therefore, *perhaps it is time to institute appropriate language designed to protect Metropolitan from the negative implications of mergers and takeovers.*

*Id.* at 2–4 (emphasis added).[15]

Indeed, MetLife does not dispute that, as a member of a bondholders' association, it

---

**15.** During discovery, MetLife produced from its

files an article that appeared in *The New York*

received and discussed a proposed model indenture, which included a "comprehensive covenant" entitled "Limitations on Shareholders' Payments." [16] As becomes clear from reading the proposed—but never adopted—provision, it was "intend[ed] to provide protection against all of the types of situations in which shareholders profit at the expense of bondholders." *Id.* The provision dictated that the "[c]orporation will not, and will not permit any [s]ubsidiary to, directly or indirectly, make any [s]hareholder [p]ayment unless ... (1) the aggregate amount of all [s]hareholder payments during the period [at issue] ... shall not exceed [figure left blank]." Bradley Resp.Aff.Exh. H, at 9. The term "shareholder payments" is defined to include "restructuring distributions, stock repurchases, debt incurred or guaranteed to finance merger payments to shareholders, etc." *Id.* at i.

Apparently, that provision—or provisions with similar intentions—never went beyond the discussion stage at MetLife. That fact is easily understood; indeed, MetLife's own documents articulate several reasonable, undisputed explanations:

> While it would be possible to broaden the change in ownership covenant to cover any acquisition-oriented transaction, *we might well encounter significant resistance in implementation with larger public companies* ... With respect to implementation, we would be faced with the task of imposing a non-standard limitation on potential borrowers, *which could be a difficult task in today's highly competitive marketplace. Competitive pressures notwithstanding, it would seem that management of larger public companies would be particular-*

*ly opposed to such a covenant since its effect would be to increase the cost of an acquisition* (due to an assumed debt repayment), a factor that could well lower the price of any tender offer (thereby impacting shareholders).

Bradley Reply Aff.Exh. D, at 3 (emphasis added). The November 1985 memorandum explained that

> [o]bviously, our ability to implement methods of takeover protection will vary between the public and private market. In that public securities do not contain any meaningful covenants, it would be very difficult for [MetLife] to demand takeover protection in public bonds. Such a requirement would effectively take us out of the public industrial market. A recent *Business Week* article does suggest, however, that there is increasing talk among lending institutions about requiring blue chip companies to compensate them for the growing risk of downgradings. *This talk, regarding such protection as restrictions on future debt financings, is met with skepticism by the investment banking community which feels that CFO's are not about to give up the option of adding debt and do not really care if their companies' credit ratings drop a notch or two.*

Bradley Resp.Aff.Exh. A, at 8 (emphasis added).

The Court quotes these documents at such length not because they represent an "admission" or "waiver" from MetLife, or an "assumption of risk" in any tort sense, or its "consent" to any particular course of conduct—all terms discussed at even greater length in the parties' submissions. *See,*

---

*Times* on January 7, 1986. The article, like the memoranda discussed above, reviewed the position of bondholders like MetLife and Jefferson-Pilot:

> "Debt-financed acquisitions, as well as those defensive actions to thwart takeovers, have generally resulted in lower bond ratings ... Of course, a major problem for debtholders is that, compared with shareholders, they have relatively little power over management decisions. *Their rights are essentially confined to the covenants restricting, say, the level of debt a company can accrue.*"

Bradley Reply Aff.Exh. H (emphasis added).

16. *See* Bradley Resp.Aff.Exh. F. That exhibit is an August 5, 1988 letter from the New York law firm of Kaye, Scholer, Fierman, Hays & Handler. A partner at that firm sent the letter to "Indenture Group Members," including MetLife, who participated in the Institutional Bondholders' Rights Association ("the IBRA"). The "Limitations on Shareholders' Payments" provision appears in a draft IBRA model indenture. *See* Bradley Resp.Aff. ¶¶ 3, 7.

*e.g.,* P. Opp. at 31–36; P. Reply at 16–17; D. Reply at 15–16. Rather, the documents set forth the background to the present action, and highlight the risks inherent in the market itself, for any investor. Investors as sophisticated as MetLife and Jefferson–Pilot would be hard-pressed to plead ignorance of these market risks. Indeed, MetLife has not disputed the facts asserted in its own internal documents. Nor has Jefferson–Pilot—presumably an institution no less sophisticated than MetLife—offered any reason to believe that its understanding of the securities market differed in any material respect from the description and analysis set forth in the MetLife documents. Those documents, after all, were not born in a vacuum. They are descriptions of, and responses to, the market in which investors like MetLife and Jefferson–Pilot knowingly participated.

These documents must be read in conjunction with plaintiffs' Amended Complaint. That document asserts that the LBO "undermines the foundation of the investment grade debt market ...," Am. Comp. ¶ 16; that, although "the indentures do not purport to limit dividends or debt ... [s]uch covenants were believed unnecessary with blue chip companies ...", Am. Comp. ¶ 17 [17]; that "the transaction contradicts the premise of the investment grade market ...", Am.Comp. ¶ 33; and, finally, that "[t]his buy-out was not contemplated at the time the debt was issued, contradicts the premise of the investment grade ratings that RJR Nabisco actively solicited and received, and is inconsistent with the understandings of the market ... which [p]laintiffs relied upon." Am.Comp. ¶ 51.

Solely for the purposes of these motions, the Court accepts various factual assertions advanced by plaintiffs: first, that RJR Nabisco actively solicited "investment grade" ratings for its debt; second, that it relied on descriptions of its strong capital structure and earnings record which included prominent display of its ability to pay the interest obligations on its long-term debt several times over, Am.Comp. ¶ 14; and third, that the company made express or implied representations not contained in the relevant indentures concerning its future creditworthiness. *Id.* ¶ 15. In support of those allegations, plaintiffs have marshaled a number of speeches made by co-defendant Johnson and other executives of RJR Nabisco.[18] In addition, plaintiffs rely on an affidavit sworn to by John Dowdle, the former Treasurer and then Senior Vice President of RJR Nabisco from 1970 until 1987. In his opinion, the LBO "clearly undermines the fundamental premise of the [c]ompany's bargain with the bondholders, and the commitment that I believe the [c]ompany made to the bondholders ... I firmly believe that the company made commitments ... that require it to redeem [these bonds and notes] before paying out the value to the shareholders." Dowdle Aff. ¶¶ 4, 7.

## III. DISCUSSION

At the outset, the Court notes that nothing in its evaluation is substantively altered by the speeches given or remarks made by RJR Nabisco executives, or the opinions of various individuals—what, for instance, former RJR Nabisco Treasurer Dowdle personally did or did not "firmly believe" the indentures meant. *See supra,* and *generally* Chappell, Dowdle and Howard Affidavits. The parol evidence rule bars plaintiffs from arguing that the speeches made by company executives

17. Due to a typographical error, the Amended Complaint contains two paragraphs numbered "17." The passage above refers to the first such paragraph.

18. *See, e.g.,* Address by F. Ross Johnson, November 12, 1987, P.Exh. 8, at 5 ("Our strong balance sheet is a cornerstone of our strategies. It gives us the resources to modernize facilities, develop new technologies, bring on new products, and support our leading brands around the world."); Remarks of Edward J. Robinson, Executive Vice President and Chief Financial Officer, February 15, 1988, P.Exh. 6, at 1 ("RJR Nabisco's financial strategy is ... to enhance the strength of the balance sheet by reducing the level of debt as well as lowering the cost of existing debt."); Remarks by Dr. Robert J. Carbonell, Vice Chairman of RJR Nabisco, June 3, 1987, P.Exh. 10, at 5 ("We will not sacrifice our longer-term health for the sake of short term heroics.").

prove defendants agreed or acquiesced to a term that does not appear in the indentures. *See West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 540, 307 N.Y.S.2d 449, 452, 255 N.E.2d 709, 712 (1969) ("The rule in this State is well settled that the construction of a plain and unambiguous contract is for the Court to pass on, and that circumstances extrinsic to the agreement will not be considered when the intention of the parties can be gathered from the instrument itself.") In interpreting these contracts, this Court must be concerned with what the parties intended, but only to the extent that what they intended is evidenced by what is written in the indentures. *See, e.g., Rodolitz v. Neptune Paper Products, Inc.*, 22 N.Y.2d 383, 386–7, 292 N.Y.S.2d 878, 881, 239 N.E.2d 628, 630 (1968); *Raleigh Associates v. Henry*, 302 N.Y. 467, 473, 99 N.E.2d 289 (1951).

■ The indentures at issue clearly address the eventuality of a merger. They impose certain related restrictions not at issue in this suit, but no restriction that would prevent the recent RJR Nabisco merger transaction. *See supra* at 1510 (discussion of Article 10). The indentures also explicitly set forth provisions for the adoption of new covenants, if such a course is deemed appropriate. *See supra* at 1510 (discussion of Article 9). While it may be true that no explicit provision either permits or prohibits an LBO, such contractual silence itself cannot create ambiguity to avoid the dictates of the parol evidence rule, particularly where the indentures impose no debt limitations.

Under certain circumstances, however, courts will, as plaintiffs note, consider extrinsic evidence to evaluate the scope of an implied covenant of good faith. *See Valley National Bank v. Babylon Chrysler–Plymouth, Inc.*, 53 Misc.2d 1029, 1031–32, 280 N.Y.S.2d 786, 788–89 (Sup.Ct. Nassau),

*aff'd*, 28 A.D.2d 1092, 284 N.Y.S.2d 849 (2d Dep't 1967) (Relying on custom and usage because "[w]hen a contract fails to establish the time for performance, the law implies that the act shall be done within a reasonable time …").[19] However, the Second Circuit has established a different rule for customary, or boilerplate, provisions of detailed indentures used and relied upon throughout the securities market, such as those at issue. Thus, in *Sharon Steel Corporation v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir.1982), Judge Winter concluded that

> [b]oilerplate provisions are … not the consequences of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture. There are no adjudicative facts relating to the parties to the litigation for a jury to find and the meaning of boilerplate provisions is, therefore, a matter of law rather than fact. Moreover, uniformity in interpretation is important to the efficiency of capital markets … Whereas participants in the capital market can adjust their affairs according to a uniform interpretation, whether it be correct or not as an initial proposition, the creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets … Just such uncertainties would be created if interpretation of boilerplate provisions were submitted to juries sitting in every judicial district in the nation.

*Id.* at 1048. *See also Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F.Supp. 1529, 1535–36 (S.D.N.Y.1983) (Sand, J.) ("[Plaintiff concedes that the legality of [the transaction at issue] would depend on a factual inquiry … This case-by-case approach is problematic … [Plain-

---

**19.** In support of this proposition, plaintiffs also rely on *Reback v. Story Productions, Inc.*, 15 Misc.2d 681, 181 N.Y.S.2d 980, *modified and aff'd*, 9 A.D.2d 880, 193 N.Y.S.2d 520 (1st Dep't 1959). The court in that case, however, was presented with an ambiguous written agreement. *See* 181 N.Y.S.2d at 983. Plaintiffs similarly rely on *Van Gemert v. Boeing Co.*, 520

F.2d 1373 (2d Cir.), *cert. denied*, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975) ("*Van Gemert I*"). In that case, however, the right asserted was addressed by an express provision which provided a framework for determining the scope and effect of the implied covenant. *See infra.*

tiff's theory] appears keyed to the subjective expectations of the bondholders ... and reads a subjective element into what presumably should be an objective determination based on the language appearing in the bond agreement."); *Purcell v. Flying Tiger Line, Inc.*, No. 82–3505, at 5, 8 (S.D. N.Y. Jan. 12, 1984) (CES) ("The Indenture does not contain any such limitation [as the one proposed by plaintiff].... In light of our holding that the Indenture unambiguously permits the transaction at issue in this case, we are precluded from considering any of the extrinsic evidence that plaintiff offers on this motion ... It would be improper to consider evidence as to the subjective intent, collateral representations, and either the statements or the conduct of the parties in performing the contract.") (citations omitted). Ignoring these principles, plaintiffs would have this Court vary what they themselves have admitted is "indenture boilerplate," P. Reply at 2, of "standard" agreements, P. Mem. at 14, to comport with collateral representations and their subjective understandings.[20]

### A. Plaintiffs' Case Against the RJR Nabisco LBO:

#### 1. Count One: The implied covenant:

In their first count, plaintiffs assert that

[d]efendant RJR Nabisco owes a continuing duty of good faith and fair dealing in connection with the contract [i.e., the indentures] through which it borrowed money from MetLife, Jefferson–Pilot and other holders of its debt, including a duty not to frustrate the purpose of the contracts to the debtholders or to deprive the debtholders of the intended object of the contracts—purchase of investment-grade securities.

In the "buy-out," the [c]ompany breaches the duty [or implied covenant] of good faith and fair dealing by, *inter alia*, destroying the investment grade quality of the debt and transferring that value to the "buy-out" proponents and to the shareholders.

Am.Comp. ¶¶ 34, 35. In effect, plaintiffs contend that express covenants were not necessary because an *implied* covenant would prevent what defendants have now done.

A plaintiff always can allege a violation of an express covenant. If there has been such a violation, of course, the court need not reach the question of whether or not an *implied* covenant has been violated.

---

**20.** To a certain extent, this discussion is academic. Even if the Court did consider the extrinsic evidence offered by plaintiffs, its ultimate decision would be no different. Based on that extrinsic evidence, plaintiffs attempt to establish that an implied covenant of good faith is necessary to protect the benefits of their agreements. That inquiry necessarily asks the Court to determine whether the existing contractual terms should be construed to preclude defendants from engaging in an LBO along the lines of the recently completed transaction. However, even evaluating *all* facts—such as the public statements made by company executives—in the light most favorable to plaintiffs, these plaintiffs fail as a matter of law to establish that the purported "fundamental basis" of their bargain with defendants created a contractual obligation on the part of the defendants not to engage in an LBO. It is first worth noting that plaintiffs have quoted selectively from certain speeches and remarks made by RJR Nabisco executives; in some respects, those public statements are more equivocal than plaintiffs would have this Court believe. *See, e.g.,* P.Exh. 3 at 25 ("[W]e believe our strong balance sheet and our debt capacity ... provide us with the flexibility to pursue any conceivable strategy or financial

option we choose.") More important, those representations are improperly raised under the rubric of an implied covenant of good faith when they cannot properly or reasonably be construed as evidencing a binding agreement or acquiescence by defendants to substantive restrictive covenants. Moreover, nothing like the mutual understanding plaintiffs now advance has been shown; in fact, as far as these parties are concerned, quite the opposite is true. *See infra* at 39–40. Thus, as a matter of law, and accepting all extrinsic evidence offered, the "implied covenant of good faith" does not serve these plaintiffs in the way they represent. As explained more fully below, by relying on extrinsic evidence and the familiar implied covenant of good faith, plaintiffs do not seek to protect an existing contractual right; they seek to create a new one, and thus to obtain a better bargain than originally agreed upon. Therefore, even if the parole evidence rule did not block plaintiffs' path, their course would not be followed.

The parole evidence rule of course does not bar descriptions of either the background of this suit or market realities consistent with the contracts at issue.

That inquiry surfaces where, while the express terms may not have been technically breached, one party has nonetheless effectively deprived the other of those express, explicitly bargained-for benefits. In such a case, a court will read an implied covenant of good faith and fair dealing into a contract to ensure that neither party deprives the other of "the fruits of the agreement." *See, e.g., Greenwich Village Assoc. v. Salle*, 110 A.D.2d 111, 115, 493 N.Y.S.2d 461, 464 (1st Dep't 1985). *See also Van Gemert v. Boeing Co.*, 553 F.2d 812, 815 ("*Van Gemert II*") (2d. Cir.1977) Such a covenant is implied only where the implied term "is consistent with other mutually agreed upon terms in the contract." *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 335, 514 N.Y.S.2d 209, 212, 506 N.E.2d 919, 922 (1987). In other words, the implied covenant will only aid and further the explicit terms of the agreement and will never impose an obligation " 'which would be inconsistent with other terms of the contractual relationship.' " *Id.* (citation omitted). Viewed another way, the implied covenant of good faith is breached only when one party seeks to prevent the contract's performance or to withhold its benefits. *See Collard v. Incorporated Village of Flower Hill*, 75 A.D.2d 631, 632, 427 N.Y. S.2d 301, 302 (2d Dep't 1980). As a result, it thus ensures that parties to a contract perform the substantive, bargained-for terms of their agreement. *See, e.g., Wakefield v. Northern Telecom, Inc.*, 769 F.2d 109, 112 (2d Cir.1985) (Winter, J.)

In contracts like bond indentures, "an implied covenant ... derives its substance directly from the language of the Indenture, and 'cannot give the holders of Debentures any rights inconsistent with those set out in the Indenture.' *[Where] plaintiffs' contractual rights [have not been] violated, there can have been no breach of an implied covenant.*" *Gardner & Florence Call Cowles Foundation v. Empire Inc.*, 589 F.Supp. 669, 673 (S.D.N.Y.1984), *vacated on procedural grounds*, 754 F.2d 478 (2d Cir.1985) (quoting *Broad v. Rock-*

*well*, 642 F.2d 929, 957 (5th Cir.) (*en banc*), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981)) (emphasis added).

Thus, in cases like *Van Gemert v. Boeing Co.*, 520 F.2d 1373 (2d Cir.), *cert. denied*, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975) ("*Van Gemert I*"), and *Pittsburgh Terminal Corp. v. Baltimore & Ohio Ry. Co.*, 680 F.2d 933 (3d Cir.), *cert. denied*, 459 U.S. 1056, 103 S.Ct. 475, 74 L.Ed.2d 621 (1982)—both relied upon by plaintiffs—the courts used the implied covenant of good faith and fair dealing to ensure that the bondholders received the benefit of their bargain as determined from the face of the contracts at issue. In *Van Gemert I*, the plaintiff bondholders alleged inadequate notice to them of defendant's intention to redeem the debentures in question and hence an inability to exercise their conversion rights before the applicable deadline. The contract itself provided that notice would be given in the first place. *See, e.g., id.* at 1375 ("A number of provisions in the debenture, the Indenture Agreement, the prospectus, the registration statement ... and the Listing Agreement ... dealt with the possible redemption of the debentures ... and the notice debenture-holders were to receive ...."). Faced with those provisions, defendants in that case unsurprisingly admitted that the indentures specifically required the company to provide the bondholders with notice. *See id.* at 1379. While defendant there issued a press release that mentioned the possible redemption of outstanding convertible debentures, that limited release did not "mention even the tentative dates for redemption and expiration of the conversion rights of debenture holders." *Id.* at 1375. Moreover, defendant did not issue any general publicity or news release. Through an implied covenant, then, the court fleshed out the full extent of the more skeletal right that appeared in the contract itself, and thus protected plaintiff's bargained-for right of conversion.[21] As the court observed,

---

**21.** Since newspaper notice, for instance, was promised in the indenture, the court used an implied covenant to ensure that meaningful,

reasonable newspaper notice was provided. *See id.* at 1383.

What one buys when purchasing a convertible debenture in addition to the debt obligation of the company ... is principally the expectation that the stock will increase sufficiently in value that the conversion right will make the debenture worth more than the debt ... *Any loss occurring to him from failure to convert, as here, is not from a risk inherent in his investment but rather from unsatisfactory notification procedures.*

*Id.* at 1385 (emphasis added, citations omitted).[22] I also note, in passing, that *Van Gemert I* presented the Second Circuit with "less sophisticated investors." *Id.* at 1383. Similarly, the court in *Pittsburgh Terminal* applied an implied covenant to the indentures at issue because defendants there "took steps to prevent the Bondholders from receiving information which they needed *in order to receive the fruits of their conversion option should they choose to exercise it.*" *Pittsburgh Terminal,* 680 F.2d at 941 (emphasis added).

The appropriate analysis, then, is first to examine the indentures to determine "the fruits of the agreement" between the parties, and then to decide whether those "fruits" have been spoiled—which is to say, whether plaintiffs' contractual rights have been violated by defendants.

The American Bar Foundation's *Commentaries on Indentures* ("the *Commentaries*"), relied upon and respected by both plaintiffs and defendants, describes the rights and risks generally found in bond indentures like those at issue:

The most obvious and important characteristic of long-term debt financing is that the holder ordinarily has not bargained for and does not expect any substantial gain in the value of the security to compensate for the risk of loss ... [T]he significant fact, *which accounts in part for the detailed protective provisions of the typical long-term debt financing instrument,* is that *the lender (the purchaser of the debt security) can expect only interest at the prescribed rate plus the eventual return of the principal.* Except for possible increases in the market value of the debt security because of changes in interest rates, the debt security will seldom be worth more than the lender paid for it ... It may, of course, become worth much less. Accordingly, the typical investor in a long-term debt security is primarily interested in every reasonable assurance that the principal and interest will be paid when due.... Short of bankruptcy, *the debt security holder can do nothing to protect himself against actions of the borrower which jeopardize its ability to pay the debt unless he ... establishes his rights through contractual provisions set forth in the debt agreement or indenture.*

*Id.* at 1–2 (1971) (emphasis added).

■ A review of the parties' submissions and the indentures themselves satisfies the Court that the substantive "fruits" guaranteed by those contracts and relevant to the present motions include the periodic and regular payment of interest and the eventual repayment of principal. *See, e.g.,* Bradley Aff.Exh. L, § 3.1 ("The Issuer covenants ... that it will duly and punctually pay ... the principal of, and interest on, each of the Securities ... at the respective times and in the manner provided in such Securities ..."). According to a typical indenture, a default shall occur if the company either (1) fails to pay principal when due; (2) fails to make a timely sinking fund payment; (3) fails to pay within 30 days of the due date thereof any interest on the date; or (4) fails duly to observe or perform any of the express covenants or agreements set forth in the agreement. *See, e.g.,* Brad.Aff.Exh.L, § 5.1.[23] Plain-

---

**22.** *See also id.* at 1383 ("An issuer of [convertible] debentures has a duty to give adequate notice either on the face of the debentures, ... or in some other way, of the notice to be provided in the event the company decides to redeem the debentures. Absent such advice as to the specific notice agreed upon by the issuer and the trustee for the debenture holders, the deben-

ture holders' reasonable expectations as to notice should be protected.").

**23.** Plaintiffs originally indicated that, depending on the Court's disposition of the instant motions, they might seek to amend their complaint to allege that "they are not equally and ratably secured under the [express terms of the] 'nega-

tiffs' Amended Complaint nowhere alleges that RJR Nabisco has breached these contractual obligations; interest payments continue and there is no reason to believe that the principal will not be paid when due.[24]

■ It is not necessary to decide that indentures like those at issue could never support a finding of additional benefits, under different circumstances with different parties. Rather, for present purposes, it is sufficient to conclude what obligation is *not* covered, either explicitly or implicitly, by these contracts held by these plaintiffs. Accordingly, this Court holds that the "fruits" of these indentures do not include an implied restrictive covenant that would prevent the incurrence of new debt to facilitate the recent LBO. To hold otherwise would permit these plaintiffs to straightjacket the company in order to guarantee their investment. These plaintiffs do not invoke an implied covenant of good faith to protect a legitimate, mutually contemplated benefit of the indentures; rather, they seek to have this Court create an additional benefit for which they did not bargain.

Although the indentures generally permit mergers and the incurrence of new debt, there admittedly is not an explicit indenture provision to the contrary of what plaintiffs now claim the implied covenant requires. That absence, however, does *not* mean that the Court should imply into those very same indentures a covenant of good faith so broad that it imposes a new, substantive term of enormous scope. This is so particularly where, as here, that very term—a limitation on the incurrence of additional debt—has in other past contexts been expressly bargained for; particularly where the indentures grant the company broad discretion in the management of its affairs, as plaintiffs admit, P.Mem. at 35; particularly where the indentures explicitly set forth specific provisions for the adoption of new covenants and restrictions, *see, e.g.,* Bradley Aff.Exh.L, § 9.1(c); and *especially* where there has been no breach of the parties' bargained-for contractual rights on which the implied covenant necessarily is based. While the Court stands ready to employ an implied covenant of good faith to ensure that such bargained-for rights are performed and upheld, it will not, however, permit an implied covenant to shoehorn into an indenture additional terms plaintiffs now wish had been included. *See also Broad v. Rockwell International Corp.,* 642 F.2d 929 (5th Cir.) *(en banc)* (applying New York law), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981) (finding no liability pursuant to an implied covenant where the terms of the indenture, as bargained for, were enforced).[25]

tive pledge' clause of the indentures." P. Reply at 12 n. 7. On May 26, 1989, shortly before this Opinion was filed, the Court granted defendants' request to assert a counterclaim for a declaratory judgment that those "negative pledge" covenants have not been violated by the post-LBO financial structure of RJR Nabisco. This counterclaim was advanced in response to notices of default by plaintiffs based on matters not raised in the Amended Complaint.

The Court of course will not now determine whether an alleged implied covenant flowing from a "negative pledge" provision has been breached. That inquiry necessarily must follow the Court's determination of whether or not the "negative pledge" provision has been expressly breached.

**24.** The Court here incorporates by reference its earlier discussion not only of plaintiffs' failure to demonstrate sufficiently a risk of irreparable harm on their motion for a preliminary injunction, but also defendants' proof concerning the financing of the LBO and the company's current equity base. *See supra* at 4–5. Consequently, the Court rejects plaintiffs' general assertion that the LBO "subjects existing debtholders to dramatically greater risk of non-payment, and the Company to a significant risk of insolvency." Am.Comp. ¶ 26. In brief, there is no implied covenant restricting any action that might subject plaintiffs' investment to greater risk of non-payment. What plaintiffs have failed to allege is that an interest or principal payment due them has not been paid, or that any other explicit contractual right has not been honored.

**25.** The cases relied on by plaintiffs are not to the contrary. They invoke an implied covenant where it proves necessary to fulfill the explicit terms of an agreement, or to give meaning to ambiguous terms. *See, e.g., Grad v. Roberts,* 14 N.Y.2d 70, 248 N.Y.S.2d 633, 636, 198 N.E.2d 26, 28 (1964) (court relied on implied covenant to effect "performance of [an] option agreement according to its terms"); *Zilg v. Prentice–Hall, Inc.,* 717 F.2d 671 (2d Cir.1983), *cert. denied,* 466

Plaintiffs argue in the most general terms that the fundamental basis of all these indentures was that an LBO along the lines of the recent RJR Nabisco transaction would never be undertaken, that indeed *no* action would be taken, intentionally or not, that would significantly deplete the company's assets. Accepting plaintiffs' theory, their fundamental bargain with defendants dictated that nothing would be done to jeopardize the extremely high probability that the company would remain able to make interest payments and repay principal over the 20 to 30 year indenture term—and perhaps by logical extension even included the right to ask a court "to make sure that plaintiffs had made a good investment." *Gardner,* 589 F.Supp. at 674. But as Judge Knapp aptly concluded in *Gardner,* "Defendants ... were under a duty to carry out the terms of the contract, but not to make sure that plaintiffs had made a good investment. The former they have done; the latter we have no jurisdiction over." *Id.* Plaintiffs' submissions and MetLife's previous undisputed internal memoranda remind the Court that a "fundamental basis" or a "fruit of an agreement" is often in the eye of the beholder, whose vision may well change along with the market, and who may, with hindsight, imagine a different bargain than the one he actually and initially accepted with open eyes.

The sort of unbounded and one-sided elasticity urged by plaintiffs would interfere with and destabilize the market. And this Court, like the parties to these contracts, cannot ignore or disavow the marketplace in which the contract is performed. Nor can it ignore the expectations of that market—expectations, for instance, that the terms of an indenture will be upheld, and that a court will not, *sua sponte,* add new substantive terms to that indenture as it sees fit.[26] The Court has no reason to believe that the market, in evaluating bonds such as those at issue here, did not discount for the possibility that any company, even one the size of RJR Nabisco, might engage in an LBO heavily financed by debt. That the bonds did not lose any of their value until the October 20, 1988 announcement of a possible RJR Nabisco LBO only suggests that the market had theretofore evaluated the risks of such a transaction as slight.

The Court recognizes that the market is not a static entity, but instead involves what plaintiffs call "evolving understanding[s]." P.Opp. at 21. Just as the growing prevalence of LBO's has helped change certain ground rules and expectations in the field of mergers and acquisitions, so too it has obviously affected the bond market, a fact no one disputes. *See, e.g.,* Chappell Dep. at 136 ("I think we would have been extremely naive not to understand what was happening in the marketplace."). To support their argument that defendants have violated an implied

---

U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984). In *Zilg,* the Second Circuit first described a contract which, on its face, established the publisher's obligation to publish, advertise and publicize the book at issue. The court then determined that "the contract in question establishes a relationship between the publisher and author which implies an obligation upon the former to make certain [good faith] efforts in publishing a book it has accepted notwithstanding the clause which leaves the number of volumes to be printed and the advertising budget to the publisher's discretion." 717 F.2d at 679. In other words, the court there sought to ensure a meaningful fulfillment of the contract's express terms. *See also Van Gemert I, supra; Pittsburgh Terminal, supra.* In the latter two cases, the courts sought to protect the bondholders' express, bargained-for rights.

**26.** *Cf. Broad v. Rockwell,* 642 F.2d at 943 ("Not least among the parties 'who must comply with or refer to the indenture' are the members of the investing public and their investment advisors. A large degree of uniformity in the language of debenture indentures is essential to the effective functioning of the financial markets: uniformity of the indentures that govern competing debenture issues is what makes it possible meaningfully to compare one debenture issue with another, focusing only on the business provisions of the issue ...") (citation omitted); *Sharon Steel Corporation v. Chase Manhattan Bank, N.A.,* 691 F.2d. 1039, 1048 (2d Cir.1982) (Winter, J.) ("[U]niformity in interpretation is important to the efficiency of capital markets ... [T]he creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets.").

covenant, plaintiffs contend that, since the October 20, 1988 announcement, the bond market has "stopped functioning." Tr. at 9. They argue that if they had "sold and abandoned the market [before October 20, 1988], the market, if everyone had the same attitude, would have disappeared." Tr. at 15. What plaintiffs term "stopped functioning" or "disappeared," however, are properly seen as natural responses and adjustments to market realities. Plaintiffs of course do not contend that no new issues are being sold, or that existing issues are no longer being traded or have become worthless.

To respond to changed market forces, new indenture provisions can be negotiated, such as provisions that were in fact once included in the 8.9 percent and 10.25 percent debentures implicated by this action. New provisions could include special debt restrictions or change-of-control covenants. There is no guarantee, of course, that companies like RJR Nabisco would accept such new covenants; parties retain the freedom to enter into contracts as they choose. But presumably, multi-billion dollar investors like plaintiffs have some say in the terms of the investments they make and continue to hold. And, presumably, companies like RJR Nabisco need the infusions of capital such investors are capable of providing.

Whatever else may be true about this case, it certainly does not present an example of the classic sort of form contract or contract of adhesion often frowned upon by courts. In those cases, what motivates a court is the strikingly inequitable nature of the parties' respective bargaining positions. *See generally,* Rakoff, *Contracts of Adhesion: An Essay in Reconstruction,* 96 Harv.L.Rev. 1173 (1982). Plaintiffs here entered this "liquid trading market," P.Mem. at 17, with their eyes open and were free to leave at any time. Instead

they remained there notwithstanding its well understood risks.

Ultimately, plaintiffs cannot escape the inherent illogic of their argument. On the one hand, it is undisputed that investors like plaintiffs recognized that companies like RJR Nabisco strenuously opposed additional restrictive covenants that might limit the incurrence of new debt or the company's ability to engage in a merger.[27] Furthermore, plaintiffs argue that they had no choice other than to accept the indentures as written, without additional restrictive covenants, or to "abandon" the market. Tr. at 14–15.

Yet on the other hand, plaintiffs ask this Court to imply a covenant that would have just that restrictive effect because, they contend, it reflects precisely the fundamental assumption of the market and the fundamental basis of their bargain with defendants. If that truly were the case here, it is difficult to imagine why an insistence on that term would have forced the plaintiffs to abandon the market. The Second Circuit has offered a better explanation: "[a] promise by the defendant should be implied only if the court may rightfully assume that the parties would have included it in their written agreement had their attention been called to it ... *Any such assumption in this case would be completely unwarranted." Neuman v. Pike,* 591 F.2d 191, 195 (2d Cir.1979) (emphasis added, citations omitted).

In the final analysis, plaintiffs offer no objective or reasonable standard for a court to use in its effort to define the sort of actions their "implied covenant" would permit a corporation to take, and those it would not.[28] Plaintiffs say only that investors like themselves rely upon the "skill" and "good faith" of a company's board and management, *see, e.g.,* P.Mem. at 35, and that their covenant would prevent the com-

---

27. *See, e.g.,* MetLife Memorandum, dated August 20, 1982, attached as Bradley Reply Aff. Exh. D, at 3; MetLife Memorandum, dated November 1985, attached as Bradley Resp.Aff.Exh. A, at 8.

28. Under plaintiffs' theory, bondholders might ask a court to prohibit a company like RJR

Nabisco not only from engaging in an LBO, but also from entering a new line of business—with the attendant costs of building new physical plants and hiring new workers—or from acquiring new businesses such as RJR Nabisco did when it acquired Del Monte.

pany from "destroy[ing] ... the legitimate expectations of its long-term bondholders." *Id.* at 54. As is clear from the preceding discussion, however, plaintiffs have failed to convince the Court that by upholding the explicit, bargained-for terms of the indenture, RJR Nabisco has either exhibited bad faith or destroyed plaintiffs' *legitimate,* protected expectations.

Plaintiffs argue that defendants have sought to blame plaintiffs themselves for whatever losses they may have incurred. Yet this Court need not address whether plaintiffs are at fault, or whether they assumed a risk in any tort sense, or whether they should never have agreed to exchange the specific debt provisions in at least two of the covenants at issue for alternative benefits and public covenants. Instead, it concludes that courts are properly reluctant to imply into an integrated agreement terms that have been and remain subject to specific, explicit provisions, where the parties are sophisticated investors, well versed in the market's assumptions, and do not stand in a fiduciary relationship with one another.

It is also not to say that defendants were free willfully or knowingly to misrepresent or omit material facts to sell their bonds. Relief on claims based on such allegations would of course be available to plaintiffs, if appropriate [29]—but those claims properly sound in fraud, and come with requisite elements. Plaintiffs also remain free to assert their claims based on the fraudulent conveyance laws, which similarly require specific proof.[30] Those burdens cannot be avoided by resorting to an overbroad, superficially appealing, but legally insufficient, implied covenant of good faith and fair dealing.

**2. Count Five: In Equity:**

Count Five substantially restates and realleges the contract claims advanced in Count I. *Compare, e.g.,* Am.Comp. ¶¶ 33, 35 ("The transaction contradicts the premise of the investment grade market and invalidates the blue chip rating that [RJR Nabisco] solicited and took the benefit from.... In the 'buy-out,' [RJR Nabisco] breaches the duty of good faith and fair dealing ...") *with* Am.Comp. ¶¶ 51–52 ("The 'buy-out' was not contemplated at the time the debt was issued, contradicts the premise of the investment grade ratings that RJR Nabisco actively solicited and received, and is inconsistent with the understandings of the market.... The 'buy-out' ... is contrary to the implied representations made by RJR Nabisco ... that it would act consistently with its obligations of good faith and fair dealing.") Along with these repetitions, plaintiffs blend in allegations that the transaction "frustrates the commercial purpose" of the parties, under "circumstances [that] are outrageous, and ... it would [therefore] be unconscionable to allow the 'buy-out' to proceed ..." *Id.* ¶¶ 52–53. Those very issues—frustration of purpose and unconscionability—are equally matters of contract law, of course, and plaintiffs could just as easily have advanced them in Count I. Indeed, to some extent plaintiffs did advance these claims in that Count. *See, e.g.,* Am.Comp. ¶ 34 ("RJR Nabisco owes a continuing duty ... not to frustrate the purpose of the contracts ..."). For present purposes, it makes no difference how plaintiffs characterize their arguments.[31] Their equity claims cannot sur-

---

**29.** The Court, of course, today takes no position on this issue.

**30.** As noted elsewhere, plaintiffs can also allege violations of express terms of the indentures.

**31.** For much the same reason, the Court rejects defendants' reliance on cases like *In re Kemp & Beatley, Inc.,* 64 N.Y.2d 63, 70, 484 N.Y.S.2d 799, 803, 473 N.E.2d 1173, 1177 (1984), for "the ancient principle that equity jurisdiction will not lie when there exists a remedy at law." *See, e.g.,* D.Mem. at 26. That case contemplated a classic equitable remedy—the dissolution of a corporation. And in that respect, it accurately set forth a rule of law; no court will, for instance, enter an injunction or order specific performance or dissolution if an adequate legal remedy remains available. The Court has already denied plaintiffs' request for an injunction. To the extent that Count V does in fact merely restate plaintiffs' prayer for injunctive relief—"it would be unconscionable to allow the 'buy-out' to proceed until defendants make restitution to the debtholders," Am.Comp. ¶ 53—it is of course inappropriate. As far as the Court can determine,

vive defendants' motion for summary judgment.

In their papers, plaintiffs variously attempt to justify Count V as being based on unjust enrichment, frustration of purpose, an alleged breach of something approaching a fiduciary duty, or a general claim of unconscionability. Each claim fails. First, as even plaintiffs recognize, an unjust enrichment claim requires a court first to find that "the circumstances [are] such that in equity and good conscience the defendant should make restitution." *See, e.g., Chase Manhattan Bank v. Banque Intra, S.A.,* 274 F.Supp. 496, 499 (S.D.N.Y.1967); P.Mem. at 56. Plaintiffs have not alleged a violation of a single explicit term of the indentures at issue, and on the facts alleged this Court has determined that an implicit covenant of good faith and fair dealing has not been violated. Under these circumstances, this Court concludes that defendants need not, "in equity and good conscience," make restitution.

Second, in support of their motions plaintiffs claim frustration of purpose. Yet even resolving all ambiguities and drawing all reasonable inferences in plaintiffs' favor, their claim cannot stand. A claim of frustration of purpose has three elements:

> First, the purpose that is frustrated must have been a principal purpose of that party in making the contract.... The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. Second, the frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the con-

tract. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made.

*Restatement (Second) of Contracts,* 265 comment a (1981). In *The Murphy Door Bed Co., Inc. v. Interior Sleep Systems, Inc.,* 874 F.2d 95 (2d Cir.1989), defendants argued that the contract was void *ab initio* since its purpose, allegedly the conveyance of trademark rights, was frustrated because the mark was generic. However, the Second Circuit concluded, "there is no indication that a transfer of trademark rights was the essence of the distributorship agreement ..." *Id.* at 102–03. Similarly, there is no indication here that an alleged refusal to incur debt to facilitate an LBO was the "essence" or "principal purpose" of the indentures, and no mention of such an alleged restriction is made in the agreements. Further, while plaintiffs' bonds may have lost some of their value, "[d]ischarge under this doctrine has been limited to instances where a virtually cataclysmic, wholly unforeseeable event *renders the contract valueless to one party." United States v. General Douglas MacArthur Senior Village, Inc.,* 508 F.2d 377, 381 (2d Cir.1974) (emphasis added). That is not the case here. Moreover, "the frustration of purpose defense is not available where, as here, the event which allegedly frustrated the purpose of the contract ... was clearly foreseeable." *VJK Productions v. Friedman/Meyer Productions,* 565 F.Supp. 916 (S.D.N.Y.1983) (citation omitted). Faced with MetLife's internal memoranda, *see, e.g.,* Bradley Resp.Aff.Exh. A, plaintiffs cannot but admit that "MetLife has been concerned about 'buy-outs' for several years." P.Opp. at 5. Nor do plaintiffs provide any reasonable basis for believing that a party as sophisticated as Jefferson–Pilot was any less cognizant of the market around it.[32]

---

however, and reading plaintiffs' "In Equity" Count as charitably as possible, the claims advanced by plaintiffs in Count V do not necessarily seek such an exclusive remedy. In general, remedies based on claims of unjust enrichment or frustration of purpose are certainly quantifiable and subject to money damages, and would thus support a legal remedy.

**32.** At least one of Jefferson–Pilot's directors—Clemmie Dixon Spangler—not only was aware of the possibility of an LBO of a company like RJR Nabisco, but he also in fact *proposed* an LBO of RJR Nabisco *itself,* a fact plaintiffs do not dispute. *See* Bradley Aff. ¶ 28, Exh. R. Spangler apparently never mentioned his unso-

■ Third, plaintiffs advance a claim that remains based, their assertions to the contrary notwithstanding, on an alleged breach of a fiduciary duty.[33] Defendants go to great lengths to prove that the law of Delaware, and not New York, governs this question. Defendants' attempt to rely on Delaware law is readily explained by even a cursory reading of *Simons v. Cogan*, 549 A.2d 300, 303 (Del.1988), the recent Delaware Supreme Court ruling which held, *inter alia*, that a corporate bond "represents a contractual entitlement to the repayment of a debt and does not represent an equitable interest in the issuing corporation necessary for the imposition of a trust relationship with concomitant fiduciary duties." Before such a fiduciary duty arises, "an existing property right or equitable interest supporting such a duty must exist." *Id.* at 304. A bondholder, that court concluded, "acquires no equitable interest, and remains a creditor of the corporation whose interests are protected by the contractual terms of the indenture." *Id.* Defendants argue that New

York law is not to the contrary, but the single Supreme Court case they cite—a case decided over fifty years ago that was not squarely presented with the issue addressed by the *Simons* court—provides something less than dispositive support. *See Marx v. Merchants' National Properties, Inc.*, 148 Misc. 6, 7, 265 N.Y.S. 163, 165 (1933). For their part, plaintiffs more convincingly demonstrate that New York law applies than that New York law recognizes their claim.[34]

Regardless, this Court finds *Simons* persuasive, and believes that a New York court would agree with that conclusion. In the venerable case of *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928), then Chief Judge Cardozo explained the obligations imposed on a fiduciary, and why those obligations are so special and rare:

Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the mar-

licited bid for RJR Nabisco to his fellow Jefferson–Pilot directors.

33. While the Court reads plaintiffs' Amended Complaint and submissions as charitably as it can, it nonetheless has trouble with assertions such as this: "The right of unsecured creditors [like plaintiffs] against having the [c]ompany's assets stripped away is not in the nature of broad fiduciary duty, but rather a specific charge, founded in principles of equity and tort law of New York and other jurisdictions ..." P.Mem. at 51–52. Any such "charge"—beyond a potential fiduciary duty the Court now addresses, *see infra*—is not, however, so "specific" as to have been stated with any clarity by any one court. Indeed, cases relied upon by plaintiffs to support their "In Equity" Count focus on fraudulent schemes or conveyances. *See, e.g., United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1295 (3d Cir.1986) (explaining lower court's findings in *United States v. Gleneagles Investment Co.*, 565 F.Supp. 556 (M.D.Pa.1983)); *Pepper v. Litton*, 308 U.S. 295, 296, 60 S.Ct. 238, 84 L.Ed. 281 (1939) ("The findings by the District Court, amply supported by the evidence, reveal a scheme to defraud creditors ..."); *Harff v. Kerkorian*, 347 A.2d 133, 134 (Del.1975) (bondholders limited to contract claims in absence of " 'fraud, insolvency, or a violation of a statute.' ") (citation omitted). Moreover, if the Court here were confronted with an insolvent corporation, which is not the case, the company's officers and directors might become trustees of its assets for the protection of its credi-

tors, among others. *See, e.g., New York Credit Men's Adjustment Bureau v. Weiss*, 278 A.D. 501, 503, 105 N.Y.S.2d 604, 606 (1st Dep't 1951), *aff'd*, 305 N.Y. 1, 110 N.E.2d 397 (1953).

If not based on a fiduciary duty and the other equitable principles addressed by the Court, plaintiffs' claim, in effect, asks this Court to use its broad equitable powers to fashion a new cause of action that would adopt precisely the same arguments the Court rejected in Count I.

34. The indenture provision designating New York law as controlling, *see supra* n. 10, would, one might assume, resolve at least the issue of the applicable law. In quoting the relevant indenture provision, however, plaintiffs omit the proviso "except as may otherwise be required by mandatory provisions of law." P.Mem. at 52, n. 46. Defendants, however, fail to argue that the internal affairs doctrine, which they assert dictates that Delaware law controls this question, is such a "mandatory provision of law." Nor do defendants respond to plaintiffs' reliance on *First National City Bank v. Banco Para El Comercio*, 462 U.S. 611, 621, 103 S.Ct. 2591, 2597, 77 L.Ed.2d 46 (1983) ("Different conflicts principles apply, however, where the rights of third parties *external* to the corporation are at issue.") (emphasis in original, citation omitted). Ultimately, the point is academic; as explained below, the Court would grant defendants summary judgment on this Count under either New York or Delaware law.

ket place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty ... Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.

*Id.* at 464 (citation omitted). Before a court recognizes the duty of a "punctilio of an honor the most sensitive," it must be certain that the complainant is entitled to more than the "morals of the market place," and the protections offered by actions based on fraud, state statutes or the panoply of available federal securities laws. This Court has concluded that the plaintiffs presently before it—sophisticated investors who are unsecured creditors—are not entitled to such additional protections.

Equally important, plaintiffs' position on this issue—that "A Company May Not Deliberately Deplete its Assets to the Injury of its Debtholders," P.Mem. at 42—provides no reasonable or workable limits, and is thus reminiscent of their implied covenant of good faith. Indeed, many indisputably legitimate corporate transactions would not survive plaintiffs' theory. With no workable limits, plaintiffs' envisioned duty would extend equally to trade creditors, employees, and every other person to whom the defendants are liable in any way. Of all such parties, these informed plaintiffs least require a Court's equitable protection; not only are they willing participants in a largely impersonal market, but they also possess the financial sophistication and size to secure their own protection.

Finally, plaintiffs cannot seriously allege unconscionability, given their sophistication and, at least judging from this action, the sophistication of their legal counsel as well. Under the undisputed facts of this case, *see supra* at 13–20, this Court finds no actionable unconscionability.

**35.** It remains unclear how the fourth security listed in the Amended Complaint fares under the controlling law. If plaintiffs purchased por-

### B. Defendants' Remaining Motions:

Defendants attack plaintiffs' fraud claims on various fronts. The Court has determined that repleading is necessary. In drafting a Second Amended Complaint, plaintiffs must bear in mind the Court's conclusions below.

#### 1. Rule 10b–5:

 Defendants move to dismiss pursuant to Fed.R.Civ.P. 12(c) Count III, the Rule 10b–5 counts, as to those six debt issues purchased by plaintiffs prior to September 1987, which is when plaintiffs allege in their complaint that defendants first began to develop an LBO plan. Plaintiffs admit that Rule 10b–5 is limited to purchases or sales during the period of non-disclosure or misrepresentation. *See Pross v. Katz*, 784 F.2d 455 (2d Cir.1986). The rule does not afford relief to those who forgo a purchase or sale and instead merely hold in reliance of a nondisclosure or misrepresentation. *See, e.g., Bonime v. Doyle*, 416 F.Supp. 1372, 1387 (S.D.N.Y.1976), *aff'd*, 556 F.2d 554 (2d Cir.), *cert. denied*, 434 U.S. 924, 98 S.Ct. 401, 54 L.Ed.2d 281 (1977). The first, second, third, fifth, seventh and eighth securities listed in the Amended Complaint fail to satisfy this requirement, at least on the facts as presently pleaded.[35] Accordingly, the Court grants defendants' motion on Count III as to those issues. Plaintiffs correctly note, however, that the disclosure-related common law fraud claims are not restricted to purchases and sales. *See Weinberger v. Kendrick*, 698 F.2d 61, 78 (2d Cir.1982) (Friendly, J.), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *Continental Insurance Co. v. Mercadante*, 222 A.D. 181, 186, 225 N.Y.S. 488, 494 (1st Dep't 1927). Thus, the Court denies defendants' motion to dismiss Count II on this basis.

#### 2. Rule 9(b):

The parties are well aware of the purposes and requirements of Rule 9(b), man-

tions of that issue prior to September 1987, then, of course, the Court's above holding applies equally here.

dating particularity in pleading fraud. Those principles have often been re-affirmed by the Second Circuit. *See, e.g., Stern v. Leucadia National Corp.,* 844 F.2d 997 (2d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988); *Di Vittorio v. Equidyne Extractive Industries,* 822 F.2d 1242 (2d Cir.1987). As it now stands, the Amended Complaint cannot on its own survive scrutiny under that rule. Plaintiffs must heed the guidelines established by the controlling Second Circuit authority. On previous occasions, this Court has left little doubt about what it expects to see in a complaint that pleads fraud. It will not take this opportunity to repeat itself and instead refers the parties to those opinions. *See, e.g., Philan v. Hall,* 712 F.Supp. 339 (S.D.N.Y.1989). The Court notes that the complaint currently before it was filed even before the January 12 close of the expedited discovery period for these motions. Moreover, since January additional discovery has taken place. Today's ruling, of course, should not be misperceived as an invitation to submit a Second Amended Complaint indiscriminately larded with factual recitations and legal boilerplate. The Court has no reason to believe that plaintiffs, represented by skilled counsel, intend to follow that unwise course.

### III. CONCLUSION

For the reasons set forth above, the Court grants defendants summary judgment on Counts I and V, judgment on the pleadings for certain of the securities at issue in Count III, and dismisses for want of requisite particularity Counts II, III, and IX. All remaining motions made by the parties are denied in all respects. Plaintiffs shall have twenty days to replead.

SO ORDERED.