GARDNER AND FLORENCE CALL COWLES FOUNDATION, Minneapolis Star & Tribune Pension Trust, Princeton Day School, David Schwartz Foundation, Scripps Clinic and Simpson College, Plaintiffs,

v.

EMPIRE INCORPORATED, Allen & Company, Incorporated, Reliance Insurance Company, S.A. Spencer, H.N. Forman, Harold M. Wit and Robert W. Plaster, Defendants.

No. 83 Civ. 6906 (WK).

United States District Court, S.D. New York.

July 5, 1984.

Fine, Kaplan & Black by Aaron M. Fine, Philadelphia, Pa., and Beldock, Levine & Hoffman by Lawrence Levine, New York City, for all plaintiffs.

Wilmer, Cutler & Pickering by James Robertson, Washington, D.C., and Werbel, Grossman & McMillin, P.C. by James C. McMillin, New York City, and Harvey J. Goldschmid, P.C., Riverdale, N.Y., for all defendants excluding Reliance.

Reliance Group Holdings, Inc. by Blair C. Fensterstock, Asst. General Counsel, New York City, for defendant Reliance.

## MEMORANDUM & ORDER

### WHITMAN KNAPP, District Judge.

Before us is defendants' motion pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted. For reasons which follow, we grant this motion.

This case involves a merger between defendant Empire Incorporated ("Empire") and Exco Acquisition Corporation ("Exco") in which Empire was the survivor. Plaintiffs, holders of convertible subordinated debentures issued by Empire prior to the merger, claim that the terms of the merger violated certain contractual rights set out in the Indenture under which the debentures were issued, and further that defendants' actions constituted a breach of fiduciary duty owed them as debenture holders.

## FACTS

Plaintiffs are the owners of $1.3 million face value of 9% convertible subordinated debentures issued by Empire in January of 1981, which debentures are due and payable on December 31, 2005. Empire sold approximately $25 million of these debentures. The debenture holders had the right to convert to Empire common stock at the ratio of 20.51 shares of stock for every $1,000 face value of debenture; or, put differently, to acquire Empire common at "conversion price" of $48.75 per share.

When the debentures were issued approximately 3 million shares of Empire common stock were outstanding. Both the debentures and the common stock were listed and trading on the New York Stock Exchange. Immediately prior to the issuance of the debentures in January 1981, Empire common was trading at approximately $49 per share (just over the $48.75 conversion price). In August of 1982 the stock traded as low as $9.50 per share. When the merger was announced in October of 1982 the stock was trading at around $20 per share, and at $27 per share immediately prior to the occurrence of the merger (still well below the $48.75 conversion price).

On June 9, 1983 Exco merged into Empire. Exco had issued 3 million shares of common stock, all of which were purchased by defendants Robert W. Plaster, S.A. Spencer, H.N. Forman, Harold M. Witt, Allen & Company and Reliance Insurance Company, for the aggregate amount of $30,000, ($.01 per share). Following approval by 96% of the Empire common shareholders who participated in the merger vote, each share of outstanding Empire common could be exchanged for $22 in cash and one new $9 face amount 9% subordinated debenture with a market value of $5.

Empire shareholders thus received $27, in the form of cash plus one new debenture, upon surrender of each share of Empire common.[1] This amounted to a $7 premium over the then $20 market price.[2] Following the repurchase of the outstanding stock, each share of Exco common stock was converted into one share of Empire common.

Prior to the merger each debenture holder was given the opportunity to convert, under the above formula, and receive the same consideration received by the Empire shareholders in the merger. The debenture holders were also informed that following the merger their debentures would continue to be convertible to Empire common. None of the debenture holders took advantage of this opportunity, presumably because the debentures were trading at a higher price than the consideration they would have received had they chosen to convert.

It is undisputed that defendants (Plaster in particular) profited from the merger. Plaster, who owned 18% of the old Empire stock, received over $11.7 million in cash and $4.8 million in principal of new debentures—a total of over $16.5 million—upon surrender of his stock which immediately prior to the merger had a market value of approximately $14.4 million. Plaster now owns 14% of Empire through the conversion of his Exco stock, for which he paid $4,188. Plaster has continued as president of Empire, with that office's substantial emoluments.

All the information above set forth was communicated in detail, prior to the merger, to Empire's shareholders, the debenture holders, the Securities and Exchange Commission and the investing public. The announcement and consummation of the merger appear to have had no adverse effect on the market price of the debentures, which have consistently traded at a higher price than the value of the conversion right.

## Count I

Count I of the amended complaint alleges that Empire breached its obligation under the Indenture by maintaining the conversion ratio of 20.51 shares per $1,000 face value of debenture instead of adjusting this ratio pursuant to § 4.05(c) of the Indenture. That section provides in part:

> In case the company shall ... distribute to all holders of share of its Common Stock evidences of its indebtedness or securities or assets (excluding cash dividends or cash distributions payable out of consolidated net income or retained earnings of the Company and its consolidated Subsidiaries, or dividends payable in shares of Common Stock) or rights to subscribe therefor ... the conversion price in effect immediately prior to such distribution shall be adjusted.... Such adjustment shall become effective on the date of such distribution retroactively to immediately after the opening of business on the day following the record date for the determination of shareholders entitled to receive such distribution....

Plaintiffs assert that the cash payment made in exchange for the surrender of the old Empire stock constituted a massive distribution of assets that should have triggered the application of this section and an adjustment of the conversion ratio. Whether or not this transaction constituted a distribution of assets in the abstract, however, a contextual reading of this section together with the remainder of the section of which it is a part (*i.e.,* § 4.05(a)(b)) and other sections of the Indenture, indicates that this is not the type of transaction that was intended to invoke an adjustment of the conversion ratio un-

---

1. In order to finance this transaction, in addition to the $3 million invested by the defendants for Exco Series A Preferred Stock, defendants arranged for a series of loans worth $1 billion which were secured by liens on the assets of Empire. Defendants also provided their personal guarantees in the aggregate of $5 million to secure the financing.

2. Just prior to the consummation of the merger, the market price of Empire stock rose to $27, which was approximately equal to the consideration paid in the merger. Defendants' Memorandum in Support of their Motion to Dismiss at 7.

der the quoted section. In light of the universally expressed need for certainty of terminology in the interpretation of bond contracts,[3] we must reject plaintiffs' tortuous reading of this provision.

Section 4.05 (of which the quoted section is a part) is an anti-dilution provision designed to protect debenture holders against the corporation's unilateral alteration of the value of their conversion right through transactions that dilute the value of the common stock. For example, if the corporation were to split its stock or issue a stock dividend—transactions which increase the number of outstanding common without increase equity value—§ 4.05 would require the conversion ratio to be adjusted to restore the proper debenture-equity ratio.

An examination of § 4.05 reveals that the transactions it was intended to govern anticipate a limited cast of characters—the company, shareholders and debenture holders—so that changes in their relative positions can be adjusted through the application of the fairly simple formula the section provides. Subsection (a) calls for the adjustment of the conversion ratio where the company changes the number of outstanding shares through the issuance of stock dividends, stock splits, stock combinations and reclassifications. Subsection (b) requires an adjustment where the company issues warrant to buy stock at below market price levels. The quoted provision (subsection (c)) anticipates distribution to shareholders in the form of dividends. All of the above are transactions to which the § 4.05 formula is readily applicable.

The fact that § 4.05(c) refers to the "record date for the determination of shareholders entitled to receive such distribution" further supports this interpretation. Generally speaking, distributions of dividends utilize "record dates" to identify the shareholders entitled to receipt of dividends as of a certain date. By contrast, a "record date" in the context of a merger applies only to the date upon which shareholders of record are entitled to vote in the merger; value-shifting events are referred to as *"effective* dates." This difference in terminology is consistently maintained throughout the Indenture. For example, 4.10 requires that the corporation give notice within 10 days of the *"record* date" of the payment of a dividend or distribution to shareholders, but within 10 days of the *"effective* date" of any merger or consolidation. The fact that the quoted provision speaks only to "record dates" strongly indicates that it should not be invoked for transactions such as the merger before us.

Additionally, the Indenture contains a separate provision—§ 4.06 [4]—which specifically governs mergers, consolidations and reorganizations. This section, in contrast to § 4.05, anticipates a change in the rela-

---

**3.** *See, e.g., Broad v. Rockwell* (5th Cir.1981) 642 F.2d 929 (*en banc*), *cert. denied* (1981) 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380.

**4.** Section 4.06 provides:

In case of any reclassification or change of outstanding shares of Common Stock deliverable upon conversion of the Debentures (other than a change in par value or from par value to no par value, or from no par value to par value, or as a result of a subdivision or combination), or in case of any consolidation of the Company with one or more other corporations (other than a consolidation in which the Company is the continuing corporation and which does not result in any reclassification or change of outstanding shares of Common Stock issuable upon conversion of the Debentures), or in case of the merger of the Company into another corporation, or in case of any sale or conveyance to another corporation of the property of the Company as an entirety or substantially as an entirety, the Company, or such successor or purchasing corporation, as the case may be, shall execute with the Trustee a supplemental indenture (which shall conform to the Trust Indenture Act of 1939 as in force at the date of the execution of such supplemental indenture) providing that the holder of each Debenture then outstanding shall have ... the right to convert such Debenture into the kind and amount of shares of stock or other securities and property, including cash, receivable upon such reclassification, change, consolidation, merger, sale or conveyance by a holder of the number of shares of Common Stock into which such Debenture might have been converted immediately prior to such reclassification, change, consolidation, merger, sale or conveyance.

tionship of the shareholders to the corporation. Thus, 4.06 mandates that in certain corporate reorganizations, the debenture holder is entitled to an opportunity to convert into common stock prior to the merger, and thus participate in the consideration given to the old shareholders. In such a situation, the use of a mathematical conversion formula like that contained in § 4.05 would be impossible to apply to the new entity formed and the complex interrelationship of the parties involved.[5]

With the introduction of § 4.06 to the task of interpreting the terms of the indenture before us, it thus becomes even clearer that an adjustment of the conversion ratio as requested by the plaintiffs is inapplicable to the Empire-Exco merger. Section 4.06 applies to mergers. Section 4.05 does not. The fact that § 4.06 by its terms does not apply to this merger because Empire was the surviving corporation is of no consequence to the determination of this motion. The sole question before us with respect to Count I is the applicability of § 4.05(c). "That [interpretation of a contract] will be chosen which best accords with the sense of the remainder of the contract, and that interpretation is favored which will make every part of the contract effective." *Broad, supra,* 642 F.2d at 947. Under this sound rule, we find § 4.05(c) to be inapplicable to the Empire-Exco merger, and dismiss Count I.

### Counts II and III

■ Both Counts II and III are conditioned upon a finding of breach of contract in Count I, and they must fall along with it. Plaintiffs contend in Count II that even if neither § 4.05 nor § 4.06 applies to the Empire-Exco merger, they are entitled to relief based upon defendants' breach of an implied covenant of good faith and fair dealing. An implied covenant, however, derives its substance directly from the language of the Indenture, and "cannot give

the holders of Debentures any rights inconsistent with those set out in the Indenture." *Broad, supra,* 642 F.2d at 957. As we have found that plaintiffs' contractual rights were not violated, there can have been no breach of an implied covenant.

■ Similarly, Count III alleges a conspiracy to induce breach of contract. In common law conspiracy "the liability is in tort, but the conspiracy is not the tort. The injury flowing from the conspiracy is the tort." *Albert Levine Assoc. v. Bertoni & Cotti* (S.D.N.Y.1970) 314 F.Supp. 169, 171. Since we have found that there was no breach, there cannot have been a breach-related injury to give rise to a cause of action for conspiracy.

### Count IV

Count IV alleges that defendant Plaster, as an officer, director and controlling shareholder of Empire, and aided by the other defendants, breached a fiduciary duty owed to plaintiffs as debenture holders. Plaintiffs claim that the merger, as "orchestrated" by the defendants, resulted in a financial windfall for the common shareholders, at a corresponding cost to plaintiffs who now bear the risk that Empire may not be able to satisfy its obligation to pay the debentures when due. Further, plaintiffs allege that defendants' actions effectively destroyed the value of their conversion right because the new Empire stock into which they are now entitled to convert is worth considerably less than the old Empire stock.

■ Fiduciary duties in a debenture contract, however, do not exist in the abstract, but are derived from the Indenture itself. As stated by the *Broad* court: "We may assume without deciding ... that [defendant] was charged with a fiduciary duty to the holders of Debentures. But since we have determined ... that [defendant]

---

**5.** We note that although plaintiffs devote several pages to discussion of the § 4.05 conversion rate, including presentations of four "hypotheticals" dealing with the conversions required where distributions are made of assets worth ½, ¾, ⅛ and ¹⁵⁄₁₆ of Empire's stock, nowhere do

they state precisely what conversion should have been effected in the situation at bar. Defendants have calculated that the formula would in fact yield a negative result—which conclusion plaintiffs dispute without providing a mathematical answer of their own.

fully complied with its obligations under the Indenture ... [defendant] can have no liability for breach of fiduciary duty." 642 F.2d at 958–59. As we, likewise, have found (as discussed above) that defendants have not breached the terms of the Indenture, we cannot find liability for breach of fiduciary duty.

Plaintiffs strongly rely on *Green v. Hamilton* (S.D.N.Y. July 14, 1981) Docket No. 76 Civ. 5433 (MJL). That case is, however, clearly distinguishable from the one at bar. *Green* concerned a contention that the defendant corporation, in a successful attempt to induce debenture holders to redeem their debentures rather than convert them into common stock, issued an intentionally false and misleading press release concerning the imminence of an impending merger. Had the debenture holders, who relied upon these false statements, chosen instead to convert, they would have participated in the merger consideration, which was greater than the consideration they received upon redemption. No such misrepresentation is—or could be—alleged in the case at bar.

Similarly, in the other case relied upon by plaintiffs, *Pittsburgh Terminal Corp. v. Baltimore & O.R. Co.*, (3d Cir.1982) 680 F.2d 933, *cert. denied* 459 U.S. 1056, 103 S.Ct. 475, 476, 74 L.Ed.2d 621, it was alleged that defendants had intentionally failed to notify debenture holders of an upcoming dividend, thus depriving them of an opportunity to convert and participate in that dividend. Again, no such failure to advise is—or could be—here alleged.

The facts of this case are, rather, closely aligned with the *Broad* case, where actions taken by the issuer in connection with a merger severely impaired the value of the debenture holders' conversion rights. The *Broad* Court found no liability where the terms of the Indenture, as bargained for, were enforced.

"A purchaser of Debentures ... takes the risks inherent in the equity feature of the security, risks that are shared with the [common stockholders]. One of

those risks is that [the issuer] might merge with another company—which is effectively the risk that any individual investor's assessment of the value of [the common stock] based on [the issuer's] prospects for the future, will be replaced by the collective judgment of the market place and other investor's in [the issuer] who might vote in favor of the merger. This—like the risk that [the issuer's] future operations might be lackluster, with the result that conversion might never be economically attractive— is simply a risk inherent in this type of investment."

*Broad, supra*, 642 F.2d. We shall follow that well-reasoned decision. Defendants in the case at bar were under a duty to carry out the terms of the contract, but not to make sure that plaintiffs had made a good investment. The former they have done; the latter we have no jurisdiction over.

■ The fact that defendant Plaster was financially successful in the merger is not, contrary to plaintiff's contentions, itself proof (indeed, does not even necessarily suggest) that he breached a fiduciary duty. The details of the merger proposal were communicated in full both to the shareholders, who voted in its favor, and to the debenture holders, who were given the opportunity to convert. The shareholders presumably approved the merger because the consideration they received was significantly greater in value than the market value of the Empire stock. By the same token, the debenture holders presumably declined to convert because their debentures were trading at an even higher value.

Plaintiffs have presented the court with absolutely no evidence to support their suggestion that as a result of the merger Empire will be unable to satisfy its contractual obligation to the debenture holders. Moreover, the actions of the shareholders and debenture holders at the time of the merger strongly indicate that the conversion right had long been rendered valueless by the operation of the market.[6]

---

**6.** Plaintiffs claim that their right to convert was "illusory" because the merger agreement provid-

Where, as here, defendants have fully complied with their obligations under the Indenture, there is no liability for breach of fiduciary duty. We therefore dismiss Count IV.

**Count V**

■ Finally, plaintiffs assert that defendants are in default pursuant to § 8.01 of the Indenture. We need not discuss the merits of this contention, as plaintiffs have failed to meet two of the prerequisites for asserting such a claim. First, they have not formally entered a notice of default, choosing instead to rely on their complaint in this action to serve this purpose. We are aware of no authority for the proposition that notice of default may so be given. Second, plaintiffs have failed to obtain the requisite participation of the holders of 25% of the outstanding principal amount of the debentures. We thus dismiss Count V as improperly brought.

In summary, we find that each Count of the complaint is fatally defective. We therefore dismiss, with prejudice, this action in its entirety.

SO ORDERED.

ed that if more than $4 million in principal amount of debentures were converted, the merger would have been aborted. This provi- sion was also communicated in Empire's Proxy Statement, but is nevertheless irrelevant as none of the debenture holders chose to convert.