**HARRIS TRUST AND SAVINGS BANK,**
an Illinois banking corporation, not individually but as Trustee; and LaSalle National Bank, a national banking association, not individually but as Trustee, Plaintiffs,

v.

**E–II HOLDINGS, INC., a Delaware corporation, Defendant.**

No. 89 C 203.

United States District Court,
N.D. Illinois, E.D.

Sept. 5, 1989.

MEMORANDUM OPINION
AND ORDER

LEINENWEBER, District Judge.

Plaintiffs, Harris Trust and Savings Bank as Trustee ("Harris") and LaSalle National Bank as Trustee ("LaSalle") (jointly referred to as the "Trustees"), are Trustees under certain Indenture Agreements dated July 1, 1987 covering two $750 million note issuances of defendant, E–II Holdings, Inc. ("E–II"). Trustees seek declaratory judgment under Fed.R.Civ.P. 57 and the Federal Declaratory Judgment Act ("FDJA"), 28 U.S.C. § 2201, seeking determination whether certain acquisitions and transactions were in compliance with the terms of the Note Indentures and the terms of the Trust Indenture Act of 1939, as well as a declaration as to the rights of the Trustees to obtain information from E–II. E–II has moved to dismiss on the grounds of lack of subject matter jurisdiction and failure to state a claim upon which relief could be granted. Alternatively, E–II moves for transfer pursuant to 28 U.S.C. § 1404(a). For the reasons stated herein, the motion to dismiss is granted.

## FACTS[1]

### A. The Creation of E–II and the Issuance of the Debt Securities

In April 1986 BCI Holdings Corporation ("BCI") acquired Beatrice Companies, Inc. ("Beatrice") in a $6.2 billion leveraged acquisition (cmplt., ¶ 11). Subsequent to the acquisition of Beatrice, E–II was formed by BCI. In May 1987 E–II had an initial portfolio of fifteen businesses that were once part of Beatrice. These fifteen companies fell into two groups: the "Consumer Products" companies and the "Food Specialties" companies (cmplt., ¶ 12).

The nine "Consumer Products" companies were:

(a) Aristokraft, Inc. ("Aristokraft"), a manufacturer of kitchen and bath cabinets;

(b) Culligan International Company ("Culligan"), a producer of water softening equipment and water treatment systems;

(c) Day–Timers, Inc. ("Day–Timers"), a marketer of daily planners and time management aids;

(d) Home Fashions, Inc. ("Home Fashions"), a manufacturer of non-drapery window coverings;

(e) Samsonite Corporation ("Samsonite"), a manufacturer of luggage;

(f) Samsonite Furniture Co. ("Samsonite Furniture"), a manufacturer of leisure and casual furniture;

(g) the Stiffel Company ("Stiffel"), a manufacturer of high quality lamps;

(h) Twentieth Century Companies, Inc. ("Twentieth Century"), a manufacturer and distributor of plumbing supplies; and

(i) Waterloo Industries, Inc. ("Waterloo"), a manufacturer of tool storage products (cmplt., ¶ 13).

The six "Food Specialties" companies were:

(a) Aunt Nellie's Farm Kitchens, Inc. ("Aunt Nellie's"), which cans and glass pack produce;

(b) Beatreme Food Ingredients, Inc. ("Beatreme"), a producer of ingredients and food flavorings used by large food manufacturers;

(c) Frozen Specialties, Inc. ("Frozen Specialties"), a producer of frozen pizzas;

(d) Lowery's Meat Specialties, Inc. ("Lowrey's"), a producer of meat snacks;

(e) Martha White Food Specialists, Inc. ("Martha White"), a processor of corn meal and grits; and

(f) Pet Specialties, Inc. ("Pet"), a producer of pet foods (cmplt., ¶ 14).

For E–II's fiscal year ending February 28, 1987, its Consumer Products companies announced operating earnings of $111 million on sales of $1.1 billion. For the same period the Food Specialties companies announced operating earnings of $34.1 million on sales of $343.8 million (cmplt., ¶ 15). On July 1, 1987, pursuant to Indentures, E–II issued to the public $1.5 billion in public debt; $750 million in Notes and $750 million in Debentures. With respect to all relevant matters hereto, the Indentures are identical. In the prospectus for the sale of both Notes and Debentures, E–II represented that it would use a substantial portion of the proceeds of the public debt offering to pursue acquisitions for the holding company (cmplt., ¶ 16).

### B. The Acquisition of E–II by American Brands

On or about December 4, 1987 E–II began acquiring a significant stock position in American Brands, Inc. ("American Brands"). As of December 4, 1987 this position was purportedly 4.3 percent of the common equity. American Brands was a holding company with subsidiaries engaged in various businesses, including the manufacture and sale of tobacco products, distilled spirits, office products and consumer products. On January 21, 1988 E–II filed

---

**1.** The facts are taken from the complaint and "cmplt., ¶ —" refers to the specific numbered paragraph in the complaint.

with the Securities and Exchange Commission ("SEC") Schedule 13D, delineating its position in American Brands stock and its intention thereto (cmplt., ¶ 17). However employing what is sometimes referred to as the "pac man" defense, American Brands, through its wholly-owned subsidiary AMBR Holdings, Inc. ("AMBR"), commenced on January 22, 1988 a takeover of E–II whereby AMBR offered to purchase all of E–II's common stock for $13.00 per share. Thus American Brands defended against any forthcoming E–II hostile takeover attempt by launching a takeover bid against the potential acquirer (cmplt. ¶ 18).

On January 25, 1988 AMBR also made an offer to purchase the Notes at 103 percent of their principal amount plus accrued interest ("Offer to Purchase"). The Offer to Purchase was premised on 51 percent of the Holders of the Notes and Debentures ("Holders") accepting the Offer to Purchase and included exit consents whereby tendering Holders waived their rights to the protective covenants of the Indentures (the Note Indenture and Debenture Indenture are referred to jointly herein as "Indentures"). The Offer to Purchase informed the Holders that American Brands intended to establish a core group of companies in E–II after merging it into a subsidiary of American Brands. The Offer to Purchase stated that other than this restructuring and merger, no transactions involving E–II were contemplated by American Brands (cmplt., ¶ 19).

Specifically, the Offer to Purchase contained the following statement:

"Parent [American Brands] believes that an acquisition of the Company [E–II] by Parent on the terms contemplated thereby represents an attractive business opportunity for Parent consistent with Parent's ongoing restructuring. In this regard, Parent intends to establish a core business consisting of Parent's Master Lock and Dexter Lock subsidiaries and the Company's Home Fashions, Waterloo, Aristokraft and Twentieth Century subsidiaries and to place the Company's Day–Timers subsidiary in Parent's office products group, which has been identified as one of Parent's emerging core businesses. The Samsonite and Culligan businesses of the Company, although not clearly complementary to Parent's core business strategy, are well regarded as leaders in their respective markets. Parent presently intends to give serious consideration to retaining such businesses although it has made no final determination in this regard. Parent intends to dispose of the specialty food segment and other businesses of the Company. The timing of any such dispositions would, of course, depend, among other things, upon market conditions and price levels that could be achieved" (cmplt., ¶ 20).

As set forth above, the Offer to Purchase also stated that E–II would be merged with either AMBR or another subsidiary of American Brands:

"Following consummation of the Equity Offer, Parent [American Brands] intends to seek to influence the management of the Company [E–II], to seek at least majority representation on the Company's Board of Directors and to seek to affect a business combination between the Company and the Purchaser or another affiliate of Parent. Parent and the Purchaser presently intend that the business combination will take the form of a merger of the Company with the Purchaser [AMBR] or another subsidiary of Parent (cmplt., ¶ 21).

Attached to the Offer to Purchase as exhibit A was a copy of the Offer to Purchase E–II's common stock which set forth at page 26 a statement confirming American Brand's plans for E–II:

"Except as indicated in this Offer to Purchase, neither [American Brands] nor the Purchaser [AMBR] has any present plans or proposals which relate to or would result in an extraordinary corporate transaction of operations, or sale or transfer of assets, involving the Company [E–II] or any of its subsidiaries, or any material changes in the Company's corporate structure or business or the composition of its Board of Directors, management or personnel" (cmplt., ¶ 22).

Harris and LaSalle have been informed by certain Holders that the import of the above quoted provisions to members of the investment community was that: (a) E–II, the company obligated to pay the Notes and Debentures, together with certain of its subsidiaries, would be merged into another subsidiary of American Brands; and (b) certain businesses of E–II not considered integral to American Brands' business would be sold outside the E–II group. No other charges were contemplated. The end result would have E–II, the company obligated to pay the debt securities, remain merged with an American Brands subsidiary, a result viewed positively in the marketplace (cmplt., ¶ 23). Harris and LaSalle also have been informed by certain Holders that in reliance upon the statements of American Brands and AMBR regarding their stated intention for E–II, the Holders of the Notes and Debentures chose not to tender their Notes and Debentures (cmplt., ¶ 24).

As referred to above, the Offer to Purchase also contained a solicitation of exit consents from the Holders of the Notes and Debentures asking them to waive the protections of Sections 4.02 (restricting the payment of dividends and other corporate actions), 4.06 (maintenance of properties), and 5.01 (when company may merge, etc.) of the Indentures (cmplt. ¶ 25 and exs. 1 and 2 thereto). On February 1, 1988 American Brands and E–II announced that E–II had agreed to be acquired by AMBR at an increased price per common share of $17.05. Following the announcement the market price of the Notes and Debentures increased above the price offered by AMBR in the Offer to Purchase. On February 29, 1988 AMBR was merged into E–II, and E–II became a wholly-owned direct subsidiary of American Brands (cmplt., ¶ 26).

While the Offer to Purchase was outstanding the Notes traded as high as at 109 percent of their par value and the Debentures traded as high as at 108 percent of their par value. Thus the market value of these securities exceeded the offer made by AMBR, and the Offer to Purchase was unsuccessful (cmplt., ¶ 27).

The Offer to Purchase the Notes and Debentures expired on February 22, 1988 (cmplt., ¶ 28). One Holder has indicated to the Trustees that there may be a question of whether or not a default existed at the time of American Brands' acquisition of E–II. According to at least one Holder the Officer's Certificates provided to the Trustees at that time did not reveal strict compliance with Section 5.01 of the Indenture in that the Consolidated Interest Expense Ratio required four fiscal quarters of E–II, which could not be provided since E–II was established in 1987 (cmplt., ¶ 29).

### C. Post–Acquisition Extraordinary Transactions

After acquisition of E–II by American Brands there began a series of transactions which have been characterized by some Holders as a stripping of E–II of subsidiaries which were desirable for less than their fair market value and the sale of a stripped-down E–II to a highly leveraged company (cmplt., ¶ 30). These post-acquisition transactions, which are described below, are referred to herein as the "Extraordinary Transactions."

On March 31st and April 15, 1988 respectively, E–II sold Day–Timers and Vogel Peterson Company ("Vogel Peterson") to subsidiaries of American Brands for $278 million cash. Despite repeated requests of E–II, the Trustees have been unable to obtain information sufficient to permit the conclusion that such sales were in compliance with the provisions of the Indentures and applicable law (cmplt., ¶ 31). After these transactions the Trustees were given the annual Officers' Certificates which happened to be due at that time and which appear to indicate general compliance with the Indentures without setting forth the factual basis for such assertion of compliance. On June 13, 1988 American Brands announced that it was selling E–II to the Riklis Family Corporation ("RFC") which was highly leveraged. RFC owns substantially all of the common stock of McGregor Holding Corporation ("McGregor") which in turn owned all of the outstanding shares of common stock of Faberge, Incorporated

("Faberge"). Following the announcement of the sale to RFC, the price of the Notes and Debentures dropped precipitously. This was reportedly indicative of the feeling in the financial markets that the Notes and Debentures would be incurring much more risk with RFC in control of the corporation because of its poorer credit rating, and because RFC, whose publicly traded debt instruments yielded as high as 18 percent in June of 1988, was substantially laden with debt (cmplt., ¶ 32). On June 27, 1988 E–II sold the following subsidiaries to American Brands for $415 million cash: Aristokraft, Waterloo, Twentieth Century, Stiffel and Aunt Nellie's. Despite repeated requests of E–II, the Trustees have been unable to obtain information sufficient to permit the conclusion that such sales were in compliance with the provisions of the Indentures and applicable law (cmplt., ¶ 33).

On July 1, 1988 McGregor Acquisition Corporation ("McGregor Acquisition"), a wholly-owned subsidiary of McGregor, purchased all one thousand outstanding shares of common stock of E–II for $950 million cash and $250 million in face amount of redeemable preferred stock of McGregor Acquisition. Immediately following the purchase McGregor Acquisition "contributed" to E–II all of the issued and outstanding shares of common stock of Faberge, whose book value was approximately $93 million, but which the Board of Directors of E–II valued at $925 million, based in part on a valuation study by investment bankers, in exchange for eight hundred forty shares of E–II common stock. Immediately following E–II's Board of Directors purportedly declared a cash dividend of $925 million, which was paid to McGregor Acquisition by E–II and subsequently used toward the payment of financial obligations incurred in connection with the acquisition of E–II's common stock by McGregor Acquisition. Despite repeated requests of EII, the Trustees have been unable to obtain information to permit the conclusion that this transaction was in compliance with the provisions of the Indentures and applicable law (cmplt., ¶ 34).

After the sale of E–II to McGregor Acquisition, upon receipt of E–II's quarterly report dated July 27, 1988, and from other sources, the Trustees believed that E–II had entered into other unusual transactions for which the Trustees have not received an explanation or justification from E–II. E–II purchased from RFC for $97 thousand the rights to receive a series of contingent payments aggregating $125 million from Guiness PLC in five annual installments to October, 1992. RFC agreed to pay any sum not received by E–II upon the maturity of this note (cmplt., ¶ 35).

E–II additionally loaned $6 million in August, 1988 to Rapid–American Company, a wholly-owned subsidiary of RFC, evidenced by a demand promissory note with interest at prime rate (cmplt., ¶ 36). On August 31, 1988 E–II sold Beatreme to "an unrelated third party" for approximately $130 million cash. E–II also entered into a letter of intent to sell Lowrey's to "an unrelated third party" for $33.5 million (cmplt., ¶ 37). As of October 27, 1988 Faberge had been utilizing funds advanced by E–II to redeem its subordinated debt in an amount of $345 million, more scheduled to have been redeemed in November, 1988 (cmplt. ¶ 38 and Mason affdvt. ex. B). On December 23, 1988 E–II announced in the *Wall Street Journal* the sale of Home Fashions to PFC Acquisitions, Inc. (cmplt., ¶ 39).

On February 13, 1989 it was reported in the *Wall Street Journal* that E–II had reached an agreement with Unilever Group ("Unilever") to sell "the bulk of Faberge, Inc." for $1.55 billion (Mason affdvt., ¶ 15 and ex. D thereto). The terms of the sale have to this date not been announced. It is unclear at this point to what extent Unilever will assume the debt of Faberge. Thus it is impossible for the Trustees to evaluate the merits of the sale and the $925 million "dividend payment" until such time as the terms of the deal are disclosed and the paydown of the Faberge debt is considered.

As recently as March 15, 1989 E–II announced the sale of yet another subsidiary, Samsonite Furniture (Mason affdvt., ¶ 15 and ex. C thereto). The terms of that transaction and its potential impact on the

Holders are likewise unknown to the Trustees.

### D. Provisions of the Indentures (cmplt., exs. 1 and 2)

The relevant articles of the Indentures include Article IV, which contains a covenant, *inter alia,* that limits stock payments, provides for notices of default and the furnishing of compliance reports; Article V which provides for changes in corporate structure; Article VI which establishes events of default and remedies; and Article VII, which provides for the rights and obligations of the Trustees.

Specifically for our purposes, Section 4.02 provides a limitation on stock payments based upon certain formulae set forth in the Section. These formulae provide maximums based upon percentages of cumulative net income with the values of non-cash items "to be determined in good faith by the Board of Directors and evidenced by a resolution of the Board of Directors." Section 4.07 requires E–II to deliver to the Trustee within one hundred days after the end of each fiscal year an Officers' Certificate stating whether or not the signers know of any default or event of default as provided for in the Indenture.

Section 5.01 provides limits on the ability of E–II to consolidate with, merge with or into, or transfer all or substantially all of its assets without complying with detailed provisions provided in this Section. Subparagraph (5) of this Section requires the company to deliver to the Trustee "an Officers' Certificate attaching arithmatic computations to demonstrate compliance with a certain consolidated interest expense ratio provided in subparagraph (4) and an opinion of counsel, each stating that such consolidation, mergers or transfers in such supplemental Indenture comply with this Section 5.01 and that all conditions precedent herein provided for relating to such transactions have been complied with."

Section 6.01 defines and describes "Events of Default." Seven different "events" are provided for, including non-payment of interest Clause (1), non-payment of principal Clause (2), incurring excessive indebtedness Clause (4), becoming subject to a final judgment in excess of $50,000,000 Clause (5), becoming involved in a voluntary or involuntary bankruptcy proceeding Clauses (6) and (7), and a catchall in Clause (3) if "the company fails to comply in any respect with any of its other agreements contained in the securities or this Indenture and the default continues for the period and after the Note specified below." Section 6.01 further provides that a default under Clause (3) "is not an event of default until the Trustee notifies the company in writing, or the Holders of at least a majority of the principal amount of the securities outstanding notify the company and the Trustee in writing, of the default and the company does not cure the default within thirty days after receipt of the notice." Section 6.03 provides that if an event of default occurs and is continuing the Trustee may pursue any available remedy by proceeding at law or in equity. Section 6.04 permits waiver of an existing default or an event of default, except a default on the payment of principal, premium, if any, or interest if the Holders of at least a majority of the principal amount of the outstanding securities by notice to the Trustee do so. Section 6.05 allows the Holders of at least a majority in the principal amount of the outstanding securities to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee. However this paragraph permits the Trustee to refuse to follow direction if it determines that to do so would unduly prejudice the rights of other security Holders. Section 6.06 limits the security Holder's right to file suit.

Section 7.01 establishes the duties of the Trustee. Subparagraph (a) requires the Trustee, if an event of default occurs and is continuing, to exercise its rights and powers vested in it by the Indenture under the prudent person rule. Clause (2) of subparagraph (b) provides that, except during the continuance of an event of default, the Trustee, in the absence of bad faith, "may conclusively rely as to the truth of the statements and correctness of the opinions expressed therein upon certificates or opinions, which by any provision of this Inden-

ture are required to be furnished to the Trustee and conform to the requirements of this Indenture. The Trustee however shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture." Section 7.02, subparagraph (b) gives the Trustee the right to "require an Officers' Certificate or an opinion of counsel before acting or refraining from acting" and "shall not be liable for any action it takes or admits to take in good faith and reliance on such certificate or opinion provided the same conform to Section 11.05." Section 7.05 requires the Trustee if a default or an event of default occurs and is continuing, to notify by mail each security Holder notice of the default or event of default within ninety days after it occurred unless it has been cured. However in the event of a default other than in the payment of principal, premium or interest, the Trustee "may withhold the notice if and so long as a committee of its Trust officers in good faith determines that withholding the notice is in the interest of the security holders." Finally, Section 11.05 provides for the contents of certificates or opinions. It provides that each certificate or opinion shall include:

"1) a statement that the person making such certificate or opinion has read such a covenant or condition;

2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

3) a statement that, in the opinion of such person, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

4) a statement as to whether or not in the opinion of such person, such condition or covenant has been complied with, and such other opinion as the Trustee may reasonably request; provided however, that with respect to matters of fact and opinion of counsel may rely on an Officers' Cer-

tificate or certificates of public officials."

### E. Communication Between E–II and the Trustees

The Trustees, despite repeated requests, have been unable to obtain information and facts from E–II which they claim is needed to permit them to conclude that the Extraordinary Transactions are consistent with the terms of the Indentures and applicable law. The position of E–II is that all that the Trustees are entitled to receive under the terms of the Indentures are the certificates and opinions which were in fact provided prior to the occurrence of most of the Extraordinary Transactions. E–II contends that those certificates and opinions are the only ones specifically provided for by the Indentures, that the Trustees must conclusively rely on such certificates and opinions, and that the Trustees may not attempt to look past such outdated certificates and opinions (cmplt., ¶ 42). Harris and LaSalle have made numerous attempts to obtain additional information regarding the Extraordinary Transactions. By a letter dated February 29, 1988 E–II sent to Harris and LaSalle the opinion of its general counsel, Karl M. Becker, that the merger of AMBR into E–II complied with the covenants and conditions of Sections 5.01 of the Indentures and all conditions precedent in the Indentures to such merger (cmplt., ¶ 43).

By Officers' Certificate dated June 7, 1988, E–II certified to Harris and LaSalle that it did not know of any default or event of default by E–II under the respective Indentures. These certificates are the annual Officers' Certificates required by the Indentures and were given prior to the announcement of the sale of E–II to McGregor Acquisition and thus would only cover the sales of Day–Timers and Vogel Peterson. No other Officers' Certificates have been received by the Trustees covering any of the other Extraordinary Transactions referred to above (cmplt., ¶ 44).

After public announcement of the proposed sale of E–II to McGregor Acquisi-

tion, and the related transactions between E–II and American Brands involving the sale by E–II to American Brands of a substantial number of E–II's operating subsidiaries, Harris and LaSalle, by letters dated June 15, 1988, requested an opinion of counsel of E–II that such transactions did not violate any provisions of the Indentures under which the debt securities were issued, including, but not limited to, Sections 4.06 and 5.01 of the Indentures. Further, the Trustees sought additional information regarding the proposed transactions and particularly the application of the cash proceeds to be received in connection with the transactions. Also, the Trustees requested a pro forma balance sheet and income statement of E–II after giving effect to the transactions (cmplt., ¶ 45). By letters dated June 22, 1988 Harris and LaSalle requested additional information regarding the adequacy of consideration paid by American Brands for the operating subsidiaries in the McGregor Acquisition transaction and also the previous transactions involving Day–Timers and Vogel Peterson. The Trustees also stated that for purposes of Sections 4.02 of the Indentures they needed to be satisfied that the consideration paid for all the above transactions was to be at least equal to the book value of the assets transferred or to be transferred to American Brands (cmplt., ¶ 46).

The Trustees each received the opinion of Chadbourne & Parke, counsel for E–II, dated June 22, 1988 stating that Sections 5.01 of the Indentures are not applicable to the sale by American Brands of the E–II stock to McGregor Acquisitions nor the sale of the subsidiaries to American Brands. For purposes of writing this opinion, counsel had been advised by E–II that the value of the assets of the divested subsidiaries was only approximately 25 percent of E–II's assets. It was also the opinion of that counsel that the sale of the divested subsidiaries at no less than their book value would be in compliance with Sections 4.02 of the Indentures. It was further the opinion of that counsel that Sections 4.06 of the Indentures, which are directed to maintenance of properties, were not applicable to the transactions related to the divested subsidiaries. Moreover, that counsel opined that even if Sections 4.06 of the Indentures were held to apply, their provisions would be met. No independent financial analysis of the transactions was performed and counsel was relying on information supplied to it by E–II. No reference or specific knowledge was disclosed in the opinions as to the Extraordinary Transactions outlined above and the effect such would have on that opinion (cmplt., ¶ 47).

The Trustees each received letters from D.L. Bauerlein, Jr., ("Bauerlein"), Vice President and Treasurer of E–II, dated as of June 22, 1988. In those letters he stated that E–II was not furnishing the financial information requested by the Trustees. According to him the furnishing of such information is not required by the Indentures (cmplt., ¶ 48).

Pursuant to a letter dated June 30, 1988 LaSalle informed E–II that the Indentures entitled LaSalle to obtain such information in order to enable LaSalle to properly discharge its duties under the Debenture Indenture. LaSalle informed E–II that without sufficient disclosure of the documentation, structure and economic effect of the transactions it might be impossible for the Holders of the Debentures and LaSalle to determine the accuracy of E–II's statements concerning compliance with the Indentures (cmplt., ¶ 49).

E–II, by letters of Bauerlein dated July 1, 1988, stated that the sales of Waterloo, Twentieth Century, Stiffel and Aunt Nellie's would be made a price at least equal to the book value thereof, and that the sales of Day–Timers and Vogel Peterson were also in excess of the book value thereof. E–II disclosed the opinion of Morgan Stanley and Company ("Morgan Stanley") dated June 14, 1988 with respect to those sales. However Morgan Stanley noted that in rendering its opinion it had not made any independent verification of the information supplied to it by E–II (cmplt., ¶ 50).

Pursuant to letters dated July 18, 1988 Harris and LaSalle wrote to Paul Weiner, current Treasurer of E–II, indicating their awareness from press reports that immediately upon the acquisition of E–II by RFC

(McGregor Acquisition) that Faberge was contributed to E–II at a value determined to be $925 million and that concurrently with such contribution a dividend of $925 million was declared and paid by E–II to RFC (McGregor Acquisition). The Trustees reminded E–II that under Sections 4.02 of the Indentures there is a restriction on the amount of dividends that may be declared and paid by E–II. This restriction will not permit so called "stock payments" (which would include other distributions on and purchases or redemptions of capital stock as well as dividends) made after February 28, 1987 to exceed a specified percentage of Cumulative Net Income plus the aggregate net proceeds received from the issuance of additional stock by E–II. The Trustees stated that in order to ascertain whether the dividend paid to RFC (McGregor Acquisition) was in compliance with the Indentures, Trustees required that E–II provide them with a satisfactory showing establishing that this restriction was not violated. The Trustees stated that they needed to have E–II confirm to them the basis upon which the value of $925 million was given to Faberge and also compliance with the other conditions for payment of this dividend under Sections 4.02. Further, the Trustees noted that the transfer of Faberge to E–II was characterized as a contribution of capital. The Trustees noted that the dividend restriction permits dividends based in part upon the issuance of additional capital stock. Normally a contribution of capital would not involve issuance of any additional stock. Trustees requested information regarding whether any additional stock was issued in connection with this transfer and the particulars of such issuance. The Trustees repeated their request for a pro forma balance sheet and an income statement of E–II giving effect to the American Brands transactions with E–II. The Trustees stated that they needed the information in order to make a determination that these transactions did not result in a sale or transfer of substantially all the assets of E–II. Trustees noted that in the opinion delivered to them, referred to above, counsel to E–II stated that the assets in question amounted to 25 percent or less of the total assets of E–II, but counsel stated that such conclusion was based upon information furnished to counsel. The Trustees indicated that they had not had the benefit of such information (cmplt., ¶ 51).

On July 21, 1988 LaSalle wrote to E–II requesting, *inter alia,* an Officers' Certificate detailing supporting facts, an Accountant's Certificate, and an Opinion of Counsel with respect to various specified aspects of the Extraordinary Transactions which had occurred or were contemplated as of that date. LaSalle requested that the certificates be in compliance with Section 11.05 of the Debenture Indenture, and that such specifically set forth any and all assumptions or any and all documents or facts which were assumed or relied upon. E–II has not complied with this request of LaSalle (cmplt., ¶ 52).

On August 10, 1988 a meeting was held at Chicago, Illinois, attended by E–II, its counsel and the Trustees. E–II denied that Trustees had any duty to make any investigation as to whether E–II was in compliance with the terms of the Indentures other than by way of receiving and examining from time to time the statements and certificates which were specifically provided for under the Indentures. E–II also denied that under the terms of the Indentures Trustees had the right to information requested in their previous letters. At the meeting on August 10, 1988 E–II indicated to the Trustees that E–II's Board of Directors had made the determination of the value of Faberge common stock at $925 million, based in part upon a valuation study by investment bankers. E–II also advised Trustees that both the investment bankers and the board of directors had considered the earnings projections of Faberge previously prepared by its chief executive officer and the fact that Faberge was operating ahead of its projections. E–II did not however provide Trustees with a copy of the valuation study of Faberge (cmplt., ¶ 53).

Trustees have continued to make requests for the valuation study and other previously mentioned information but such

has not been forthcoming. E–II has indicated that it might consider providing the valuation study if the Trustees would agree to keep such confidential from the Holders of the Notes and Debentures. Trustees however do not feel they are in a position to agree because of what they perceive to be their fiduciary duty to the Holders to such a request. On November 16, 1988 counsel for E–II again met with the Trustees in Chicago with respect to this matter. However E–II again declined to produce the requested information, opinions and certificates in the form specified (cmplt. ¶ 54). Trustees do not contend that they have been denied any of the certificates or opinions specifically required by the Indentures. They do apparently contend that, at least by implication, Section 11.05 of the Indentures requires E–II to set forth specific information which will allow the Trustees to determine whether the certificates or opinions furnished comply with the other requirements of the Indentures.

### F. Notices of Default

Harris, as of January 3, 1989, received notices of default which purported to be delivered by the Holders of a majority of the amount of the Notes. Such notices state in relevant part:

"Reference is also made to the condensed financial statements contained in the Quarterly Report for the quarter ended May 31, 1988, of E–II. In note 8 to those Financial Statements, E–II makes the following statement:

'On July 1, 1988 all the outstanding common stock of E–II was sold to McGregor. On July 2, 1988 in exchange for 840 shares of E–II common stock, E–II received a capital contribution from McGregor of all of the issued and outstanding common stock of Faberge, Incorporated ("Faberge") which recently acquired Elizabeth Arden. The new board of directors of E–II valued the stock of Faberge, after careful consideration and advice of outside independent appraisers, at $925

million. Immediately following the contribution, a dividend of $925 million was declared and paid by E–II to McGregor, the proceeds of which were applied toward repayment of the financing obligation incurred in connection with the acquisition of E–II.'

The payment by E–II to McGregor of the 'dividend' of $925 million described in the quote above constitutes a violation of Section 4.02 of the Indenture. Accordingly, as a consequence of E–II's failure to comply with Section 4.02 of the Indenture a default has occurred and is continuing as specified by Section 6.01(3) of the Indenture.

Therefore, pursuant to Section 6.01 of the Indenture, the undersigned hereby demands that the foregoing default be remedied" (cmplt., ¶ 55).

By letters dated December 28, 1988 Holders of the Notes who had given notice of default were informed by E–II, with copy to Harris, that their assertion that a violation of Sections 4.02 of the Indenture has occurred is false and wholly unsupported by fact. Further, E–II contended that each notice of default was defective and improper in that such failed to specify the alleged default in any meaningful way, and E–II has demanded that such be withdrawn (cmplt., ex. 23).[2]

### G. Trustees' Lawsuit

On January 10, 1989 Trustees, in order to obtain a judicial determination of the dispute which exists between E–II and the Holders as to the proper interpretation of the Indentures and applicable law, filed the instant suit.

Trustees request herein that the court determine, *inter alia:*

"(1) whether the acquisition of E–II by American Brands was in compliance with the terms of the Indentures and principles of applicable law and equity, including the implied covenants of good faith and fair dealing;

(2) whether the post-acquisition Extraordinary Transactions were in

---

**2.** This notice was subsequently withdrawn when it was discovered that an error in computation had been made so that a majority of the amount

of the Notes had not in fact joined in giving E–II notice (*see* Grim affdvt., ex. C).

compliance with the terms of the Indentures and principles of applicable law and equity, including the implied covenants of good faith and fair dealing;

(3) whether E–II has complied with the provisions of the Trust Indenture Act, including but not limited to Section 314, which requires evidence of compliance with indenture provision;

(4) whether an Event of Default has occurred on the Notes or the Debentures within the meaning of Section 315 of the Trust Indenture Act;

(5) whether or not the assets remaining in E–II are sufficient to generate sufficient revenues to ensure payment of principal, interest and sinking fund obligations of the Notes and Debentures;

(6) what actions the Trustees should take with respect to the Notices of Default Harris has received in the light of the letter from E–II declaring such ineffective;

(7) declaring whether any future asset sales by E–II can be permitted and, if so, under what circumstances;

(8) declaring to what information the Trustees are entitled in order to determine if unusual occurrences such as the Extraordinary Transactions violate the terms of the Indentures" (cmplt., ¶ 90).

E–II claims that it is necessary for the Trustees to take a position regarding the existence of a default as a prerequisite to establish the existence of a case or controversy. E–II further claims that Trustees' failure to do so prevents the court from having jurisdiction.

### H.  Further Development Regarding Notices of Default

On Thursday, January 19, 1989 Harris, through its counsel, was informed by counsel for the Holders of the Notes who had delivered the notices of default that because of an error in computation as to its holdings by one of the Holders who had given notice, Harris was in possession of notices of default by slightly less than a majority of the principal amount of the Notes.  A letter to this effect followed on January 20, 1989 (Grimm affdvt., ex. C). Since that time Trustees have received further notices of default (Mason affdvt., ¶ 14) although they admit that a majority of Holders is still lacking.

### I.  Current Procedural Status

E–II has moved to dismiss for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.  Alternatively, E–II has moved for transfer under 28 U.S.C. § 1404(a).

### DISCUSSION

The gravamen of E–II's motion is that Trustees' complaint does not state a case or actual controversy within the meaning of Article III of the Constitution and, accordingly, there is no jurisdiction to hear this case.  In essence, Trustees, according to E–II, are merely asking the court for advice on how to interpret their rights under the Note Indentures.  This according to E–II amounts to a request for an advisory opinion which a district court has no jurisdiction to issue.

The FDJA provides that federal courts may issue declaratory judgments only in cases of "actual controversy" thus making it constitutional under Section 2 of Article III of the Constitution.  A "controversy" must be one that is appropriate for judicial determination and is definite and concrete and touching upon the legal relations of the parties having adverse legal interests, as opposed to a dispute of a hypothetical or abstract character.  *Connecticut v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937).  As is often the case, these generalities are less than a sure guide to decision and the difference between an abstract question and a controversy is one of degree and there is no precise test for determining the presence of a controversy. "Basically the question in each case is whether the facts alleged, under all of the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Mary-*

*land Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). With these principles in mind it is necessary to analyze the facts of this case and what Trustees are actually requesting.

The basic complaint of the Trustees is that after E–II was acquired by American Brands it began a series of transactions, described earlier in this opinion, which have been characterized by some but not a majority of the Holders of the securities as a stripping of subsidiaries for less than their fair market value, which was followed by a sale of a "stripped-down" E–II to a highly leveraged company, RFC, which caused the price of the securities to drop precipitously in the market. Subsequent to this a further transaction involving subsidiaries of RFC was carried out which in effect caused E–II to purchase the outstanding shares of Faberge, a company owned by a subsidiary of RFC, at a value greatly in excess of Faberge's book value. However E–II has furnished Trustees with all of the certificates and opinions specifically required of it by the Indentures, each attesting to the fact that these transactions were carried out in accordance with the Indentures. There is no contention that any of these certificates and opinions failed to comply with the formal requirements of Section 11.05 of the Indentures. Trustees however complain that E–II has resolutely refused to provide them with any detailed financial information to permit verification of the matters contained in the certificates which they contend violate certain implied requirements of the Indentures. As a result Trustees contend that they are powerless to verify whether any of the transactions and acquisitions constituted an "Event of Default" as the same is defined in the Indentures. They contend that although paragraph 7.02(b) permits them to rely on these certificates, the Indentures do not say that they must rely on them nor do the Indentures prohibit further investigation by the Trustees in order to verify the accuracy of the certificates. They further contend that Section 7.02(b) requires that they determine that the certificates conform with the requirements of Section 11.05 and

that this requires access to financial details. Essentially they argue that E–II ought not to be permitted to conceal a violation of the Indentures if it has in fact committed a violation.

On the other hand, E–II argues that the Indentures do not give Trustees the power to require E–II to turn over information not specifically provided for and therefore it has no duty to do so. Instead, Trustees are to rely on the statements and certificates for which the Indentures specifically provide. E–II further argues that under New York law (which both parties agree apply) where there is an instrument that contains a specific covenant regarding a subject there are no covenants to be implied concerning that subject. *Broad v. Rockwell Intern. Corp.,* 642 F.2d 929, 957 (5th Cir.1981). Since the Indentures contain specific covenants covering what E–II must disclose to the Trustees, no additional covenants to provide information not specifically provided for can be implied.

E–II also argues that there is no actual controversy between the parties because the Trustees have been unwilling or unable to declare a default. Therefore the real purpose of their lawsuit is to get an advisory opinion from this court whether they have the power to do so. In support E–II cites *People v. Archer–Daniels–Midland,* 704 F.2d 935 (7th Cir.1983).

In *Archer–Daniels–Midland* the State's Attorney of Peoria County filed a suit that was eventually removed to federal court. This suit sought a declaration whether an Illinois statute prohibiting the employment of professional strikebreakers was preempted by the National Labor Relations Act. The appeals court concluded that there was no subject matter jurisdiction to make such a declaration because the disagreement with regard to the validity and scope of the Illinois Strikebreaker's Act had not ripened into an actual controversy between the state and the defendant. In so finding the court pointed out that the State's Attorney had not yet decided whether to bring criminal charges against Archer–Daniels–Midland nor did the complaint allege that he intended to do so in

the event of a declaration or no preemption and, apparently, "before making up his mind he wanted to know whether he might become a cropper on preemption." Rather than to ask experts on labor law for advice on this issue, he decided to seek advice from what he thought was a more authoritative quarter, the courts.

"Evidently he will not make a final decision whether to prosecute Archer–Daniels–Midland until he gets authoritative judicial advice. There is thus no actual controversy between him and the company but only a potential controversy that will become actual if and when he prosecutes. Regardless of the advice the court gave, there is nothing compelling the State's Attorney to act on it."

Comparing the facts here as alleged by Trustees in their complaint and the facts in *Archer–Daniels–Midland* appears to foreclose the relief sought by the Trustees with respect to whether E–II violated the Indentures creating an "Event of Default." For a variety of reasons, including lack of information and lack of sufficient Holder participation, Trustees have declined to declare an event of default under the terms of the Indentures. Even if this court should conduct the lengthy evidentiary hearings necessary for it to make an independent determination that an event of default had in fact occurred with regard to one or more of the transactions, so as to empower the Trustees to act, the Indentures do not require them to act. Under Section 7.05, in the event of a default other than payment of principal, Trustees may withhold the notice if the Trustees determine withholding is in the interest of the security Holders. Even if the Trustees did act, under Sections 6.04 of the Indentures, the security Holders holding a majority of the principal amount of indebtedness have the power to overrule the Trustees. Therefore any opinion that the court might issue could be nothing more than an advisory opinion, advising Trustees of their rights but not resolving any actual case or controversy. *Archer–Daniels–Midland* at p. 941. The Trustees, in effect, at all times have the power to create a controversy but

they have not yet done so nor do they have to do so.

Trustees do not even try to distinguish *Archer–Daniels–Midland*. They instead argue their right to standing in behalf of the security Holders citing cases such as *GMC v. Calif. Bd. of Equalization*, 815 F.2d 1305, 1307–08 (9th Cir.1987), which gave standing to fiduciaries of employee benefit plans. *See* also *Central Montana Electric Power Corp. v. Administrator*, 840 F.2d 1472, 1474–75 (9th Cir.1988) (giving standing to cooperatives), and *Adams v. Morton*, 581 F.2d 1314, 1319 (9th Cir. 1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1498, 59 L.Ed.2d 771 (1979) (giving standing to representatives of Indian tribes). In each of these cases however the group represented had suffered a "distinct and palpable" injury and the plaintiff was allowed to proceed in its representative capacity. On the other hand, in this case neither the Trustees nor the Note Holders have as yet alleged any injury and instead are proceeding in the realm of conjecture and hypothesis. A party may proceed in a representative capacity only if it alleges facts sufficient to make out a case or controversy had those it represents themselves brought suit. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 2214, 45 L.Ed.2d 343 (1975). Consequently none of these cases help the Trustees with the case or controversy issue.

Trustees also in support of their position point to a suit brought by E–II in New York as tacit recognition that a case and controversy exists between the parties. However that action was precipitated by a notice of default issued by an alleged majority of Note Holders and sought a declaration that a notice of default was invalid (Grim affdvt., ex. D). E–II denied that a default existed, that a default had been properly declared, and that a majority of Note Holders had joined in the notice of default. Thus an actual controversy existed. Once it was admitted that a majority of Note Holders had not joined, thus invalidating the default, E–II dismissed the New York suit (Grim affdvt., ex. F).

Finally, Trustees could precipitate an actual controversy by declaring a default or by convincing the Holders of a majority of the principal amount of notes to join them in doing so under Clause (3) of Section 6.01 for failure to abide by the terms of the Indentures. This they have been unwilling or unable to do.

Accordingly, based on *Archer–Daniels–Midland,* there is no subject matter jurisdiction to advise Trustees whether the various acquisitions and transactions were in compliance with the terms of the Note Indentures.

In accord with this is *Gardner & Florence Call Cowles Foundation v. Empire, Inc.,* 589 F.Supp. 669 (S.D.N.Y.1984). Here debenture holders brought suit against the obligor claiming that the merger with another corporation violated contractual rights set out in the indenture under which the debentures were issued. *Inter alia,* plaintiffs sought a declaration that defendant was in default. The court noted that plaintiffs had neither declared a default themselves nor obtained the requisite participation of the security holders of 25 percent and therefore dismissed the claims as improperly brought, *id.* at p. 675.

■ Reading Trustees' brief indicates however that their real complaint is with the lack of information supplied to it by E–II concerning these acquisitions and transactions. They point out that the Extraordinary Transactions described in their complaint have drastically changed the character of E–II, including the nature of the risk. They charge that if E–II is permitted to conceal the details of these transactions they will be powerless to make an independent determination as to whether a default has occurred. They are faced with a Hobson's choice to declare a default in a vacuum and run the risk of triggering cross-default provisions in other E–II loan agreements, possibly precipitating the commencement of bankruptcy proceedings, or to fail to declare a default and perhaps endanger the repayment rights of the security Holders.

Arguably an actual dispute may exist over Trustees' rights to additional information.[3] Trustees claim that under the Indenture agreements they are entitled to detailed information to make an informed decision that the certificates of compliance it received from E–II are accurate, i.e., that the transactions certified do comply. E–II strenuously denies that Trustees are entitled to any information whatsoever. A declaration of the court could actually resolve this dispute. Consequently this claim has the elements of controversy that is lacking in Trustees' other claims. In fact E–II seems to recognize there is a judicial controversy here. E–II argues instead that Trustees' complaint, rather than failing for want of jurisdiction insofar as it seeks a declaration of their right to information, fails to state a claim upon which relief may be granted.

The gist of E–II's argument is that the right to the information demanded is not expressly provided for in the Indentures and therefore the rule against implied covenants in New York (*see Hazzard v. Chase Nat'l Bank of N.Y.C.,* 159 Misc. 57, 287 N.Y.S. 541, 567 (1936), *aff'd,* 257 App.Div. 950, 14 N.Y.S.2d 147 (1939), *aff'd,* 282 N.Y. 652, 26 N.E.2d 801 (1940), *cert. denied,* 311 U.S. 708, 61 S.Ct. 319, 85 L.Ed. 460 (1940)), controls. Although Trustees admit that there is no specific provision in the Indentures entitling them to the information they request, they insist that the Indentures must be construed to effectuate their purpose—to protect the security Holders. They argue that since nothing in the Indentures precludes the right of the Trustees to investigate further in the event they have doubts regarding the reliability of the certificates and opinions, they are entitled to receive this information. Trustees also refer to the Trust Indenture Act of 1939 ("TIA") and its philosophy of protecting security holders as providing a basis for an

**3.** It also arguably does not. A failure to provide information could constitute an "Event of Default" under Clause (3) of Section 6.01. Accordingly, it could constitute a basis for a notice of default if done so in accord with the terms of Section 6.01. Trustees have not proceeded this way.

expansive view of the Trustees' rights to information.

However neither the Indentures nor the TIA appears to require the obligor to furnish information not specifically provided for in the Indentures themselves and Trustees, as we have seen, do not refer the court to any specific provision in the Indentures, nor do they refer us to any provision of the TIA requiring the furnishing of such information.

The only provision in the TIA that appears to cover the subject of the obligor providing information to the trustee is Section 314 (15 U.S.C. § 77nnn). Subparagraph (a)(2) requires the obligor to file with the indenture trustee under rules and regulations prescribed by the SEC:

> "such additional information with respect to compliance by such obligor with the conditions and covenants provided for in the indenture, as may be required by such rules and regulations ..."

However the court has been unable to find any such rules and regulations prescribed by the SEC pursuant to this section (*see* 17 C.F.R. 260.0–1 *et seq.*) and neither party has referred to any such rule or regulation. Further, subparagraph (f) of Section 77nnn provides:

> "Nothing in this section shall be construed either as requiring the inclusion in the indenture ... of provisions that the obligor upon the indenture securities shall furnish to the indenture trustee any other evidence of compliance with the conditions and covenants provided for in the indenture than the evidence specified in this section, or as preventing the inclusion of such provisions in such indenture, if the parties so agree."

The philosophy appears to be that an obligor ought to be protected from having to disclose what could constitute sensitive information other than what the security laws and the rules and regulations issued

pursuant to these laws require unless the obligor specifically agrees to do so.

Therefore absent any specific requirement in the Indentures, E–II is under no obligation under New York law, the TIA, or rules and regulations issued under authority of the TIA to furnish information on its acquisitions or transactions other than the certificates and opinions expressly provided for.

Accordingly, to the extent that the court has jurisdiction to entertain Trustees' complaint, it appears that the complaint fails to state a claim upon which relief can be granted.

## CONCLUSION

For the reasons herein stated, E–II's motion is granted and the complaint is dismissed.[4] Since this action disposes of the case it is unnecessary to rule on E–II's motion to transfer pursuant to 28 U.S.C. § 1404(a).

IT IS SO ORDERED.

**4.** The complaint contains two counts: Count I for declaratory judgment and Count II for indemnity for plaintiffs' costs and attorney's fees for bringing this action and for their costs in administering the trusts. Defendant has moved to dismiss on the ground that there is no indication that any controversy exists with regard to their entitlement to such claims. Plaintiffs have failed to respond to defendant's motion and it is therefore granted.